Leon W. KNIGHT, et al., Plaintiffs,

v.

MINNESOTA COMMUNITY COLLEGE
FACULTY ASSOCIATION, et al.,
Defendants.

No. 4–74 Civ. 659.

United States District Court,
D. Minnesota,
Fourth Division.

March 31, 1982.

Opinion on Motion to Amend and Relief
from Judgment Aug. 13, 1982.

Larson, Senior District Judge, con-
curred and dissented with statement.

Edwin Vieira, Jr., Silver Spring, Md., John J. Fogarty, Springfield, Va., for plaintiff National Right to Work Legal Defense Foundation, Inc.

Darel F. Swenson, Wayzata, Minn., for plaintiffs.

Oppenheimer, Wolff, Foster, Shepard & Donnelly, Eric R. Miller, St. Paul, Minn., for Wise, Barrett, Herndon and Lambert, Klinkerfues, Morgan, Schutt, Harris, Holman, Mondale, Rosasco, Provo, Gallop, Norman, Durhan, Bell, Minke, Chesebrough, NEA, MEA, MCCFA, IMPACE.

Donald J. Mueting, Sheila S. Fishman, Sp. Asst. Attys. Gen., St. Paul, Minn., for Crippen, McVay, Sontorovich, Plunkett, Nycklemoe, Bruce, Helland, Helling, Lord and Denison.

Before HEANEY, Circuit Judge, ALSOP, District Judge, and LARSON, Senior District Judge.

## MEMORANDUM OPINION AND ORDER

HEANEY, Circuit Judge.

### MEMORANDUM OPINION

Plaintiffs are community college faculty members who challenge the constitutionality of the Minnesota Public Employment Labor Relations Act (PELRA) as applied in the community colleges. Essentially two issues are raised: whether the Minnesota Community College Faculty Association (MCCFA) may act as an exclusive representative under PELRA, and whether the "meet and confer" provisions of PELRA are valid on their face and as applied. Following extensive proceedings and an independent review of the exhaustive record, we entered findings of fact on November 17, 1981, which are attached hereto. This memorandum opinion incorporates our conclusions of law and order for judgment.

## I.

### MCCFA AS AN EXCLUSIVE REPRESENTATIVE

The structure of collective bargaining under PELRA and MCCFA's role thereunder may be summarized as follows. PELRA provides several mechanisms by which an employee organization may be designated as the exclusive representative of an appropriate bargaining unit. *See* Minn.Stat. § 179.67. The MCCFA is an association of faculty members of the community colleges in Minnesota. It is not disputed that the MCCFA facially qualifies as an employee organization, that community college faculty are an appropriate unit under PELRA,[1] and that the MCCFA was properly certified as an exclusive representative in 1971.

Public employers have an obligation, under PELRA, to "meet and negotiate"[2] with respect to compensation and other "terms and conditions of employment." *Id.,* § 179.66, subd. 2. When an exclusive representative has been certified, the employer may negotiate only through that representative. *Id.,* § 179.66, subd. 7. The Minnesota State Board for Community Colleges (MSBCC) has negotiated four collective bargaining agreements with the MCCFA since 1971.

Employees are not required by statute to join the MCCFA. Indeed, PELRA expressly provides that employees have "the right not to form [or] join" an employee organization. *Id.,* § 179.65, subd. 2. The contract negotiated by the MCCFA applies to all community college faculty members and its economic benefits flow to all faculty regardless of whether they are members of the MCCFA. PELRA provides that a fair share fee may be collected by an employee

organization from nonmember employees that it represents, not to exceed 85% of members' regular dues. *Id.* Such a fee has been collected from plaintiffs by the MCCFA. Determination of the amount of the fee is not in dispute, but we note that PELRA does provide a procedure by which employees may challenge calculation of the fair share fee. *Id.*

The foregoing describes a system of public sector collective bargaining which is common to many states insofar as it applies to traditional subjects of collective bargaining.[3] *See generally,* Edwards, *The Emerging Duty to Bargain in the Public Sector,* 71 Mich.L.Rev. 885 (1973). The essential character of such systems is implicated by two claims which the plaintiffs advance here.

### A.

Plaintiffs' first contention is that because the MCCFA is a private organization, it holds an impermissible power under PELRA to make "economic laws" and its function constitutes an impermissible delegation of state sovereignty. Under this theory, only a quasi-state agency—some branch of the public employer—may constitutionally serve as the employee representative. We reject this theory.

The State of Minnesota has not impermissibly delegated its sovereign power. The employer's duty to negotiate under PELRA "does not compel the public employer or its representative to agree to a proposal or require the making of a concession." Minn. Stat. § 179.66, subd. 2. Negotiated agreements with state employees and even arbitration awards must be "submitted to the legislature to be accepted or rejected." *Id.,* § 179.74, subd. 5. Contract terms successfully bargained by the MCCFA have been,

---

1. The certification of community college faculty as a single, statewide bargaining unit was upheld in *Minn. State College Bd. v. Public Employment Relations Bd.,* 303 Minn. 453, 228 N.W.2d 551 (1975).

2. The duty to meet and negotiate is defined as: the performance of the mutual obligations to meet at reasonable times, including where possible meeting in advance of the budget making process, with the good faith intent of

entering into an agreement with respect to terms and conditions of employment; provided, that by such obligation neither party is compelled to agree to a proposal or required to make a concession.
Minn.Stat. § 179.63, subd. 16.

3. The "meet and confer" provisions of PELRA fall outside the traditional scope of collective bargaining and are examined *infra* at p. 7.

in fact, subsequently modified by the state legislature. The state might well find it in its own interest to confer more authority upon its employers or to afford public employees more of the rights held by private employees, but we need not speculate on modifications of PELRA that might occur. It is clear that the present structure under PELRA does not impermissibly abridge the state's sovereign power.

In contending that the legislature's retained authority under PELRA is constitutionally inadequate, plaintiffs rely heavily on *Carter v. Carter Coal Co.,* 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), and *Schecter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). Plaintiffs also rely on these cases for the proposition that PELRA confers upon the MCCFA an impermissible power to make "economic laws."[4] The continuing vitality of *Schecter* and *Carter Coal,* however, is doubtful at best.[5] Moreover, even if *Schecter* and *Carter Coal* might have some vitality in another context, plaintiffs' reliance on them here is clearly foreclosed by the Supreme Court's decision in *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). *Abood* squarely upholds the constitutionality of exclusive representation bargaining in the public sector.

*Abood* is central to this case and warrants elaboration. *Abood* involved a public employee bargaining statute similar to Minnesota's PELRA.[6] The plaintiffs in *Abood* were teachers who had not joined the private employee organization which served as their exclusive representative. Like the plaintiffs here, the teachers objected to compulsory fair share fees on First Amendment grounds. The Supreme Court had previously rejected such claims in the private sector, holding that agency shop arrangements were supported by compelling state interests. *See Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Railway Employees Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). In *Abood,* the Court reaffirmed that exclusive representation

> avoids the confusion that would result from attempting to enforce two or more agreements specifying different terms and conditions of employment. It prevents inter-union rivalries from creating dissension within the work force and eliminating the advantages to the employee of collectivization. It also frees the employer from the possibility of facing conflicting demands from different unions, and permits the employer and a single union to reach agreements and settlements that are not subject to attack from rival labor organizations.

*Id.* 431 U.S. at 220–221, 97 S.Ct. at 1791–1792 (citations omitted).

Moreover, the *Abood* Court reiterated that the agency shop arrangement has been found to "distribute fairly the cost of [collective bargaining] among those who benefit, and it counteracts the incentive that employees might otherwise have to become 'free riders'—to refuse to contribute to the union while obtaining benefits of union rep-

---

4. The plaintiffs called several witnesses and devoted extensive time and resources to develop the theory that PELRA is the functional equivalent of both the legislation struck down in *Schecter* and *Carter Coal,* and of the "corporate-state model of Italian fascism." These theories are without merit in light of the controlling principles of *Abood.*

5. *See e.g., Quincy College v. Burlington Northern, Inc.,* 328 F.Supp. 808, 811 (N.D.Ill.1971) ("The *Schecter* and *Panama* [*Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935)] cases have been severely limited to their own facts"); *Simon v. Cameron,* 337 F.Supp. 1380, 1382 n. 1 (C.D.Cal.1970) (*Carter*

*Coal* "has been distinguished and disregarded in recent years to such an extent that it is believed that the Carter non-delegation doctrine is dead"). *See also,* Davis, Administrative Law Treatise, §§ 3:2, 3:8, 3:12 (1980) ("That the literal opinions in the *Panama* and *Schecter* cases do not embody the effective law is entirely clear").

6. The Michigan statute at issue in *Abood* provided for designation of an exclusive representative and for collection of fair share fees from employees who were represented by, but not members of, the employee organization. *Abood, supra* 431 U.S. at 212–215, 97 S.Ct. at 1787–1789.

resentation that necessarily accrue to all employees." *Id.* at 222, 97 S.Ct. at 1792.

These state policy interests are just as compelling in the public sector. As the Court stated in *Abood, supra* at 224, 97 S.Ct. at 1794, "[t]he desirability of labor peace is no less important in the public sector, nor is the risk of 'free riders' any smaller." Although the agency shop in the public sector necessarily impacts on First Amendment rights, the *Abood* Court found such concerns outweighed by the compelling state interests in orderly labor relations. *Id.* at 222–223, 229–231, 97 S.Ct. at 1793, 1796–1797.

The *Abood* decision is controlling here.[7] The State of Minnesota has expressly declared that the purpose of PELRA is "to promote orderly and constructive relationships" between public employers and employees and that such a purpose "may best be accomplished" by the bargaining structure provided under PELRA. Minn.Stat. § 179.61. As the *Abood* Court noted, such a determination by the state is to be afforded great weight in the constitutional balance. *Abood, supra* at 229, 97 S.Ct. at 1796. Moreover, such a determination rests on a long tradition in Minnesota of recognizing the importance of the agency shop in resolving traditional subjects of collective bargaining. *See e.g.,* Minn.Stat. § 179.16 (providing for exclusive representation in the private sector since the 1940's); *see also,* Note, *Certification of a Bargaining Representative under the Minnesota Labor Relations Act,* 38 Minn.L.Rev. 827 (1954); Note, *History and Provisions of the Minnesota Labor Relations Act,* 24 Minn.L.Rev. 217 (1940). Minnesota may provide for exclusive representation by an employee association in the public sector and may require

that nonmembers of the association financially support its collective bargaining efforts through a fair share fee. No constitutional infirmity arises merely because the employee association is a private organization.

**B.**

■ Plaintiffs' second contention rests on a factual assertion that the MCCFA, alone and in conjunction with its affiliates, constitutes a quasi-political party or predominantly a political-action organization. The legal claim is that compulsory fair share fees therefore result in forced association with a political party contrary to *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and its progeny. Our resolution of this claim is again guided by the Supreme Court's decision in *Abood, supra.*

The teacher-plaintiffs in *Abood* argued that bargaining activity of a public sector union is inherently political and that compulsory financial support of such activity therefore violates First Amendment associational rights. The Supreme Court acknowledged that "decisionmaking by a public employer is above all a political process," *id.* 431 U.S. at 228, 97 S.Ct. at 1796, and noted "[t]here can be no quarrel with the truism that because public employee unions attempt to influence governmental policymaking, their activities * * * may be properly termed political." *Id.* at 231, 97 S.Ct. at 1797. The Court, however, made clear that such "differences between public and private sector collective bargaining simply do not translate into differences in First Amendment rights."[8] *Id.* at 232, 97 S.Ct. at 1798. Following the precedent set in the

---

**7.** The concurring opinion in *Abood, supra* at 254, 259 n. 13, 97 S.Ct. at 1809, 1811 n. 13, makes clear that the majority holding forecloses the specific claim of plaintiffs here. Even if we were not bound by *Abood,* however, we would reject the plaintiffs' claim for the reasons set forth herein.

**8.** The plaintiffs here argue that allowing a public sector union to be politically active in any

respect will confer an unconstitutional political advantage upon public employees. The *Abood* Court acknowledged that public employees might achieve additional influence through political activity. *Id.* at 228, 97 S.Ct. at 1796. In upholding public sector bargaining and political activity related to such bargaining, the *Abood* Court found no constitutional significance in this "political advantage" theory. Nor do we.

private sector,[9] the Court held that public sector unions may collect compulsory fair share fees notwithstanding the "political" character of public bargaining—so long as the fees "are applied to collective bargaining, contract administration, and grievance adjustment purposes." *Id.* at 232, 97 S.Ct. at 1798. The crucial distinction is union political activity *unrelated* to collective bargaining. The *Abood* Court held that persons opposing such activity may not be compelled to support it through fair share fees. *Id.* at 235–236, 97 S.Ct. at 1799–1800.

In attempting to show that the MCCFA is predominantly a political action organization, the plaintiffs have persistently ignored the distinction between activities related and those unrelated to collective bargaining. The plaintiffs have instead insisted that activity of the MCCFA which is in any sense "political" must be considered wholly separate from collective bargaining activity.[10] This approach paints with a brush so broad as to obliterate the distinction that the *Abood* Court found to be crucial for constitutional purposes.

We emphasize that the plaintiffs do not advance a narrow claim that some part of their fair share fees are misused for political activity unrelated to collective bargaining. Calculation of the fair share fee is not in dispute here and we note that there is a statutory procedure for resolving any such dispute.[11] The plaintiffs' claim is that the MCCFA and its affiliates are so overwhelmingly engaged in political activity that they must be deemed to be the equivalent of a political party for constitutional purposes. In light of *Abood,* the factual inquiry turns on whether the activities of MCCFA are related or unrelated to collective bargaining. We have placed the burden on the defendant labor organizations to establish that their activity properly relates to collective bargaining.[12]

Extensive evidence was adduced with respect to the activities of the MCCFA and the other defendant labor organizations, the Minnesota Education Association (MEA), the National Education Association (NEA) and IMPACE (a political action committee affiliated with the MEA). Hundreds of exhibits were introduced by plaintiffs and defendants that relate to the character of activity undertaken by the labor organizations. Numerous staff and officers of the organizations testified as to the extent and character of their political activity. We have independently reviewed the exhaustive record developed before the special master. As our findings indicate,[13] the record establishes beyond any doubt that the MCCFA, MEA and NEA are properly characterized as public employee organizations whose political activities relate closely and directly to collective bargaining.

Plaintiffs devoted extensive time and resources to a theory that the MCCFA, MEA, NEA, IMPACE and NEA-PAC (a political action committee affiliated with the NEA) are a single, integrated organization that functions as a quasi-political party. This theory is without merit as a factual matter. IMPACE and NEA-PAC are indeed political action committees, but even members of MEA and NEA do not automatically give support to these committees. These are independent political action committees organized under state and federal law for the purpose of participating in partisan election contests; membership in and support for

9. *See Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Railway Employees Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956).

10. *See e.g.,* findings of fact at 12–13.

11. *See* Minn.Stat. § 179.65, subd. 2. In a challenge to the fair share fee, the burden is on the employee association to justify the determination of the fee amount. *Id.*

12. The plaintiffs in a constitutional challenge ordinarily have the burden of establishing that a constitutional violation exists. In *Abood,* however, the Supreme Court indicated a special concern for the difficulty that individual nonmembers of a union would face in attempting to trace and account for the use of their fair share fees. Accordingly, we have placed the burden on the defendants here to establish whether their activities predominantly relate to collective bargaining.

13. *See* findings of fact at 7–13.

IMPACE and NEA-PAC is wholly voluntary. MCCFA is affiliated with MEA and NEA and has derived substantial assistance from the latter two organizations during strikes and other collective actions. The MCCFA, however, independently charts its course of collective bargaining on behalf of community college faculty. Finally, even if MCCFA, MEA and NEA were deemed to be in some sense "integrated," the outcome would not change because each of these organizations is predominantly engaged in activities closely and directly related to collective bargaining.

The MCCFA has engaged in legislative activity virtually of necessity because collective bargaining agreements negotiated by the MCCFA must be submitted to the legislature for approval or rejection. *See, supra* at p. 3. There is simply no basis in this record, however, on which the MCCFA could be deemed anything other than a public employee organization whose purpose is to improve through collective bargaining the terms and conditions of employment for the college faculty it represents.

The plaintiffs' claim therefore fails in two respects. To the extent it rests on the notion that a public sector labor organization cannot engage in political activity that relates directly to collective bargaining, it is plainly wrong as a matter of law. To the extent it rests on a factual claim that the MCCFA is predominantly engaged in political activity *unrelated* to collective bargaining, it is flatly contradicted by the record. Such activity is not even a significant, much less a predominant, part of the MCCFA's total activity.

## II.

## MEET AND CONFER

PELRA distinguishes traditional subjects of collective bargaining from all other issues that arise between employers and employees. The traditional matters—compensation and other "terms and conditions of employment"—are subject to mandatory bargaining in which employers and the exclusive representative of employees must negotiate in good faith to reach an agreement. *See* Minn.Stat. §§ 179.63, subd. 16, subd. 18; 179.65, subd. 4; 179.66, subd. 1, subd. 2, subd. 7. On all matters not subject to this "meet and negotiate" process, professional employees have the express right to "meet and confer" with their employer. *Id.,* § 179.65, subd. 3. Similarly, PELRA imposes a duty upon employers to meet and confer on such matters with professional public employees. *Id.,* § 179.66, subd. 3.

The state interest underlying the meet and confer process is set forth in the statute:

The legislature recognizes that professional employees possess knowledge, expertise, and dedication which is helpful and necessary to the operation and quality of public services and which may assist public employers in developing their policies. It is, therefore, the policy of this state to encourage close cooperation between public employers and professional employees by providing for discussions and the mutual exchange of ideas regarding all matters not specified under [the meet and negotiate provisions].

*Id.,* § 179.73, subd. 1.

As a general matter, the meet and confer concept reflects enlightened labor policy and a legitimate state interest in securing the insight of public employees on questions outside the traditional scope of collective bargaining. There is no constitutional infirmity in requiring public employers to solicit and meaningfully consider the views of public employees.

As applied to higher education, the meet and confer process recognizes and codifies a longstanding tradition of a faculty participation in college governance. In light of this tradition of shared decisionmaking, the state has a special interest in securing the views of faculty members on questions of college governance. No college administrator needs this Court to describe the faculty response to unilateral decisionmaking on issues of importance on campus—the literature in the field is more than sufficient. *See e.g.,* Mayhew, L.B., *Surviving the Eighties,* p. 226 (1979) ("It is really the

faculty that grants administrators the mandate to govern, and that mandate can be removed by both overt and covert means"); Ladd & Lipset, *The Divided Academy,* pp. 243–299 (1975); D. Walker, *The Effective Administrator* (1979); H. Mason, *College and University Government,* pp. 44–99 (1972) (suggesting that shared authority is "the mode of *rapprochement* between bureaucracy and professionalism in institutions of higher education").

Nothing in the Constitution would require that the state abandon what appears to be an essential component of college administration—involving the faculty in a broad range of governance decisions. Thus, no infirmity whatsoever attaches to the threshold meet and confer provisions of PELRA—those which require administrators to meet and confer with faculty and which declare the right of the faculty to meet and confer with administrators. *See* Minn.Stat. §§ 179.65, subd. 3; 179.66, subd. 3.

The state also requires that professional employees select a representative for purposes of the meet and confer process. Minn.Stat. § 179.73, subd. 2. This requirement is separate from the selection of an exclusive representative for purposes of mandatory bargaining.[14] Regardless of whether a bargaining representative has been selected, PELRA requires some selection system for purposes of the meet and confer process. As applied to higher education, this effectively compels the establishment of a faculty governance system to function in the meet and confer process.

The meet and confer committees that presently operate[15] are in fact the exclusive formal governance system for resolving issues outside the scope of mandatory bargaining. The collective bargaining agreement provides, for example, that the meet and confer committees "will have full authority in the assigned area to present the views of the employees * * *." The testimony of college administrators confirms that, although persons may still express their individual views outside the formal process, the "official" view of the faculty is the position adopted by the meet and confer committees. Thus, the weight and significance of individual speech interests have been consciously derogated in favor of systematic, official expression. On any issue that has campus-wide impact, it is difficult to imagine that isolated individual views would have any weight when compared to the "official" view of the faculty. If some faculty members are excluded from participation and deliberation in the meet and confer process, they are effectively denied any meaningful expression on the issues resolved through that process.

The subjects considered by meet and confer committees at the community colleges have included the college budget, curriculum reviews, new course proposals, college organization and campus facilities. Moreover, the scope of the meet and confer process in community colleges sweeps across all issues in college governance that are not subject to mandatory bargaining. These issues in higher education have a special character as a matter of tradition, public policy and constitutional law.

Traditionally, the subjects of meet and confer have been resolved through governance systems in which all faculty members have an opportunity to participate. In the present case, governance at community colleges prior to passage of PELRA consisted of faculty senates and committees, selected through elections in which every faculty member was eligible to both vote and seek election.

Public policy supports the tradition of participation by all faculty members. The free and full exchange of ideas lies at the

---

**14.** Minn.Stat. § 179.73, subd. 2, is a one-sentence requirement that is silent as to the method of selecting meet and confer representatives. In contrast, elaborate procedures are set forth elsewhere for selecting an exclusive representative for purposes of collective bargaining. *See* Minn.Stat. § 179.67.

**15.** The committees are called "exchange of views" committees at the local campus level and "meet and confer" committees at the statewide level. Use of the term "meet and confer" herein refers to both levels of committees.

core of academia's contribution to our society. To protect these values, our society has attempted to insulate institutions of higher education from the orthodoxies of life outside the campus—be they commercial, religious or political orthodoxies that might inhibit the marketplace of ideas.

■ The right of expression by faculty members also holds a special place under our Constitution, as the Supreme Court has broadly declared. In *Keyishian v. Board of Regents of New York,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967), the Court stated:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment.

In *Shelton v. Tucker,* 364 U.S. 479, 480, 487, 81 S.Ct. 247, 248, 251, 5 L.Ed.2d 231 (1960), the Court emphasized that "[t]he vigilant protection of constitutional freedoms is no where more vital than in the community of American schools." Similarly, in *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957), the Court declared:

> The essentiality of freedom in the community of American universities is almost self-evident. * * * To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.

These cases do not directly control the present matter,[16] but they illustrate that the First Amendment has a special significance in higher education. The vital concern for academic freedom warrants a heightened standard of scrutiny when, as here, the state regulates the forum for academic speech.

■ We must weigh these constitutional values against the state interest in making the meet and confer process an orderly one. The state has provided that the right to meet and confer may only be exercised through selection of representatives in a governance system. It vigorously contends that requiring some selection process is essential if the meet and confer process is to be effective. We are inclined to agree. Absent such a requirement, administrators in the community college system would be expressly compelled to meet regularly [17] with each faculty member and group of members that desired to so confer. The result could well be that no meaningful faculty expression would emerge and that both faculty and administrators would be deprived of the benefits from an orderly, systematic exchange of views.

We cannot ignore, however, that the state has created a forum for the exchange of views between faculty and administrators on all issues outside the scope of mandatory bargaining. The meet and confer process may not be a general public forum,[18] but it is an important academic forum. Indeed, it is the only significant forum for the faculty to resolve virtually every issue outside the scope of mandatory bargaining. This structure effectively blocks any meaningful expression by faculty members who are excluded from the formal process. If the state is going to intervene in this manner, we think it must afford all faculty members a fair opportunity both to serve as and to participate in the selection of meet and confer representatives. Thus, Minn.Stat. § 179.73, subd. 2, which requires faculty members to select

**16.** The issue here is whether faculty members may be excluded from participating in selection of meet and confer representatives and from serving as such representatives, which is a question of first impression.

**17.** PELRA requires that formal meet and confer sessions be held at least three times a year. *See* Minn.Stat. § 179.73, subd. 2. The spirit and practice, however, have been to meet more often than this, generally on a monthly basis.

**18.** If the meet and confer sessions were a public forum, an absolute free speech right would attach in terms of access to that forum. *See City of Madison v. Wisc. Empl. Comm.,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). *See also,* Finkin, *The Limits of Majority Rule in Collective Bargaining,* 64 Minn.L.Rev. 183, 245–249 (1980).

such representatives, is constitutionally valid so long as every faculty member is afforded a fair opportunity to participate in the selection process.

We emphasize the narrowness of this holding.[19] We are not confronted with a faculty governance system developed independent of state compulsion, which would present different considerations. We are not confronted with ad hoc committees or other temporary governance mechanisms which might present special needs for expediency. Nor have we yet addressed what role a faculty union might play in a governance system. We hold only that when the state compels creation of a representative governance system in higher education and utilizes that forum for ongoing debate and resolution of virtually all issues outside the scope of collective bargaining, it must afford every faculty member a fair opportunity to participate in the selection of governance representatives.[20]

The State of Minnesota has gone one step further in structuring the meet and confer process. PELRA provides that the employer may meet and confer "only through the exclusive representative," if there be one. *See* Minn.Stat. § 179.66, subd. 7. Pursuant to this provision, the collective bargaining contract confers upon the MCCFA the sole authority to select the meet and confer representatives. The MCCFA has held this exclusive power since the passage of PELRA, and has exercised it to exclude nonmembers of the MCCFA from serving on the meet and confer committees.

This practice of systematically excluding nonmembers of the MCCFA obviously deprives such persons of a fair opportunity to participate in the meet and confer process. It also infringes the First Amendment associational rights of faculty members who do not desire to join the MCCFA.

Moreover, the MCCFA's exclusive authority to select the committee representative—regardless of how it is actually exercised—inherently creates a chilling effect on the associational and speech interests of faculty members. The scope of the meet and confer committees reaches many issues that are integral to the professional function of a college professor. If one risks exclusion from these committees by not joining or speaking out against the MCCFA, it seems self-evident that one's freedom not to join or to so speak out is seriously impaired. This risk of exclusion is inherent in the MCCFA's sole authority to select the committee members. The actual practice only bears out that the risk of exclusion is a real one.

Because these effects infringe fundamental First Amendment guarantees, the MCCFA's exclusive selection authority can be upheld only if it is supported by compelling, legitimate state interests which cannot be furthered by less intrusive means. We find no such interests here.

The state does not contend that it has a legitimate interest in excluding nonmembers of the MCCFA from serving on meet and confer committees. Indeed, the state interest expressly underlying the meet and confer process—obtaining the views of employees on matters outside the scope of collective bargaining—argues for hearing the views of all employees not just those that are union members. The state does contend that the meet and confer process must be an orderly, systematic one, but this interest can be fully served without excluding nonmembers of the MCCFA. The process would be no less orderly, for example, if both members and nonmembers of the MCCFA participated in electing committee members.

The core issue is whether the rationale for the agency shop in traditional collective

19. This holding, of course, applies only to higher education.

20. Selection of the present meet and confer committee members, for example, might be conducted under MCCFA auspices in fully open elections—such that members and nonmembers of MCCFA could both vote and seek elec- tion. We could not find that such a system deprived anyone of a fair opportunity to participate. To precisely define "fair opportunity," however, would require that we speculate on governance structures that are not before us. We decline to do so.

bargaining applies with the same force to the meet and confer process in higher education. We think it does not.

A fundamental element of the agency shop rationale is that, absent collective representation, the employees as a whole could not effectively participate in decisions that are the subject of representation. This, indeed, is a key factor in making union security a legitimate interest of the state. In higher education, however, faculty members have long enjoyed substantial formal and informal participation in college governance—present here in the form of faculty senates prior to PELRA. Such a tradition of shared decisionmaking has not been generally true in other areas of employment or even at other levels of public education. In these other contexts, the state may properly seek to balance labor relations by providing the strongest possible role for a union, but the same state interest is simply not as strong in higher education. If college administrators excluded faculty from matters of governance, there would be a more compelling justification for exclusive union control of faculty governance selection.

Another crucial factor involves the largely economic, tangible nature of traditional collective bargaining. Joining a union cannot constitutionally be made a condition of employment and it is thought that because the tangible benefits of bargaining flow to both members and nonmembers alike, no coercion to join will result in practice. The subjects of meet and confer, however, are generally intangible issues of governance, such as curriculum proposals and academic standards. It simply cannot be said that the benefits of conferring on such issues flow equally to persons who are excluded from conferring. Indeed, the record shows that at least one faculty member joined the MCCFA because he considered participation in the meet and confer process essential to his particular position. Several others also testified that they considered such participation to be an essential part of serving on the faculty. This is precisely the kind of impermissible "joining as a condition of employment" which results from the unique character and tradition of governance in

higher education. It does not result, however, from exclusive representation on matters within the traditional scope of collective bargaining because the tangible fruits of such bargaining flow to all employees regardless of whether they are members of the labor organization.

A third factor involves the union's legitimate need for security, which is generally promoted by excluding rival unions from representing segments of the same bargaining unit and by requiring nonmembers of the union to pay their fair share of the costs of collective bargaining, contract administration and grievance processing. Union security will not be jeopardized by allowing nonmembers of the MCCFA to participate in selection of meet and confer representatives. The MCCFA remains the exclusive representative for all matters subject to the mandatory bargaining provisions. No rival unions could simultaneously represent community college faculty. The MCCFA continues to have sole control over mandatory bargaining, contract administration and grievances. It continues to collect fair share fees from nonmembers to defray the costs of such efforts. No one therefore gets a free ride on the important efforts expended in these areas.

Another factor in the agency shop rationale is that, absent such a system, the employer would be subject to irreconcilable conflicting demands from rival unions. Much of this concern arises because the employer is under a mandatory duty to bargain. Here, however, the mandatory bargaining process remains under the sole control of the MCCFA. In no event would the employer be forced to bargain with more than one group.

The subject matter of meet and confer committees and the scope of mandatory bargaining are mutually exclusive. Of course, it is difficult to draw a line between the two jurisdictions, but this is inevitable unless all issues are subject to just one process or the other. This line drawing has already reached the Minnesota Supreme Court three times since PELRA was enact-

**12**

ed. *See General Drivers Union Local 346 v. Ind. Sch. Dist. No. 704*, 283 N.W.2d 524 (Minn.1979); *Mpls. Fed. of Teachers v. Mpls. Special Sch. Dist. No. 2*, 258 N.W.2d 802 (Minn.1977); *Int'l Union of Operating Engineers v. City of Mpls.*, 305 Minn. 364, 233 N.W.2d 748 (1975). Although there may be an added dimension to the line drawing if the meet and confer committees are open to nonmembers of the MCCFA, the line drawing itself is essentially unchanged. The question remains one that frequently arises in labor law—whether a particular issue is subject to mandatory bargaining.

We thus conclude that the rationale which properly supports the agency shop generally does not justify the MCCFA's sole authority to select meet and confer representatives in the community colleges.

The MCCFA contends that the present practice is not different in any material way from the faculty senate system which preceded PELRA. The argument is that majority selection of a labor organization is the equivalent of majority selection of a faculty senate. Despite its superficial appeal, this contention glosses over constitutional differences between the two systems. The plain fact is that all faculty members formerly had the right to vote for individual representatives that would deal with issues of college and faculty governance. All faculty members could also seek to serve in such roles. These rights are now completely lost unless one joins the MCCFA. The right to even speak out on such issues is further impaired by the knowledge that one could be excluded from serving in the process if the MCCFA should desire to retaliate for protected speech activity. The former faculty senate system did not impair these First Amendment interests, interests which are paramount in the context of higher education.

We hold that the First Amendment interests of faculty members are infringed if the labor organization has sole authority to se-

lect meet and confer representatives and that such infringement, in the context of higher education, is not supported by overriding state interests.[21] The contract provision establishing such exclusive selection is therefore void and section 179.66, subd. 7, of PELRA is declared unconstitutional insofar as it requires or allows such a practice in the meet and confer context.

In so holding, we do not suggest that a labor organization cannot play a major role in the meet and confer process. To the contrary, the state has an obvious interest in harmonizing the meet and negotiate process with the meet and confer process. Moreover, the MCCFA, as the representative of a majority of the faculty, has a legitimate claim to a significant role in the meet and confer process. If, for example, the present structure were operated under the auspices of the MCCFA, but committee memberships were open to and elected by all faculty, including nonmembers of the MCCFA, legitimate state interests could be served without the constitutional impairments of the present system.

We again emphasize the narrowness of our holding. We are not confronted with a faculty union's role in ad hoc governance mechanisms which might arise from time to time. The need for administrative expedience and potential for impairment of associational rights might well lead to a different result. We will not speculate, however, on the constitutionality of governance mechanisms that are not before us.

III.

SUMMARY

1. The Minnesota Community College Faculty Association (MCCFA) may act as an exclusive representative pursuant to PELRA, Minn.Stat. § 179.61 *et seq.*

(a) The provisions of PELRA that allow for an exclusive representation system of collective bargaining and that impose duties to "meet and negotiate" with respect to

---

**21.** Nothing in our holding should be viewed as if it also applies outside the context of higher education.

compensation and other terms and conditions of employment are constitutionally valid on their face and as applied in the community colleges;

(b) No constitutional violation arises from the MCCFA's status as a private organization. PELRA, on its face and as applied, does not impermissibly delegate sovereign state power nor impermissibly confer any power to make "economic laws;"

(c) No constitutional violation arises from the MCCFA engaging in limited political activity which relates directly to its collective bargaining efforts. MCCFA's function as an exclusive representative under PELRA does not result in any compelled association with a quasi-political party. The MCCFA and the organizations with which it is affiliated (The Minnesota Education Association and National Education Association) do not together constitute a single integrated organization nor are they, alone or in conjunction, a quasi-political party.

2. The present practice of having the MCCFA select all representatives on meet and confer committees is unconstitutional. Such practice has an inherent chilling effect on the associational and speech interests of nonmembers of the MCCFA and, unlike exclusive control over the "meet and negotiate" process, is not supported by compelling state interests.

(a) The meet and confer provisions of PELRA are valid insofar as they impose upon employers the duty to meet and confer and provide employees the right to meet and confer. Nothing in the Constitution requires that the state abandon what appears to be essential in college administration—involving the faculty in college governance;

(b) The provisions requiring employees to select meet and confer representatives, Minn.Stat. § 179.73, subd. 2, as applied to the community colleges, effectively requires and has resulted in the establishment of a formal governance system which is the primary mechanism for expressing faculty views on all issues outside the mandatory bargaining process. This provision is valid as applied to community colleges only if all faculty members have a fair opportunity both to select and serve as governance representatives.

(c) The clause of the collective bargaining contract which gives the MCCFA sole authority to select meet and confer representatives is void, and the statutory provision which requires the employer to meet and confer only through such organization is invalid insofar as it allows or requires the present practice. See Minn.Stat. § 179.66, subd. 7.

(d) The foregoing would not preclude conducting the meet and confer process under the auspices of the MCCFA, so long as both members and nonmembers have a fair opportunity to select and serve on the meet and confer committees.

ORDER FOR JUDGMENT

The constitutional infringements caused by the present meet and confer process in the community colleges clearly occur under color of state law. The Minnesota State Board for Community Colleges, in its official capacity, and the Minnesota Community College Faculty Association must equally share liability inasmuch as they together negotiated the aspects of the present structure which we have found violate plaintiffs' constitutional rights. There is no basis for individual liability or for finding any defendants liable other than the MSBCC and the MCCFA.

The parties have stipulated to nominal money damages of one dollar and we find that no other money damages are appropriate. The plaintiffs are entitled to declaratory and injunctive relief in accordance with this opinion. Therefore, PELRA as applied to the community colleges is declared valid in all respects, except

(1) Minn.Stat. § 179.73, subd. 2, is declared valid so long as all community college faculty members are provided a fair opportunity both to select and serve as meet and confer representatives;

(2) Minn.Stat. § 179.66, subd. 7, is declared unconstitutional only insofar as it allows or requires an exclusive representa-

tive in the community colleges to have sole authority to select meet and confer representatives;

(3) The clause of the collective bargaining contract conferring sole selection authority upon the MCCFA is declared invalid, and the MCCFA is enjoined from making any further selections of meet and confer representatives pursuant to such clause.

The defendants shall bear their own costs in this proceeding and 20% of plaintiffs' costs shall be taxed to the MSBCC and the MCCFA, to be borne in equal shares.

Judgment shall be entered in accordance with this order.

LARSON, Senior District Judge, concurring and dissenting.

I am in substantial agreement with the Memorandum Opinion and Order but dissent as to paragraphs (1), (2), and (3) in the Order for Judgment.

### ON MOTIONS TO AMEND AND RELIEF FROM JUDGMENT

HEANEY, Circuit Judge.

This Court issued its Findings of Fact in the above-captioned matter on November 16, 1981 and its Memorandum Opinion on March 31, 1982. Plaintiffs have filed objections to the findings and conclusions therein and have moved, under Rules 52, 59 and 60, to amend such findings, for relief from judgment and for a new trial. Plaintiffs also have moved for a hearing on the calculation of attorneys' fees to which they may be entitled. Defendants have moved to amend the Court's judgment insofar as it taxes 20 per cent of plaintiffs' costs against the MCCFA and MSBCC. We deny all of these motions.

 Defendants' motion to reduce the proportion of costs taxed against them is grounded on their contention that no more than 5–6 per cent of plaintiffs' efforts were expended on the "meet and confer" issue, the one issue on which plaintiffs prevailed. Plaintiffs have not disputed that the "meet and confer" issue was largely a discrete

question of law and fact. Nor have they challenged defendants' assertions that the "meet and confer" issue was addressed in only 3 per cent of plaintiffs' exhibits, 6 per cent of the trial transcripts, .004 per cent of plaintiffs' proposed stipulations and by none of plaintiffs' expert witnesses. Nonetheless, we recognize that there is some overlap between the First Amendment claim as to meet and confer practices and the other practices challenged by plaintiffs. The determination of costs is not a mechanical matter and courts are afforded broad discretion in making such determinations. *Environmental Defense Fund, Inc. v. Callaway,* 497 F.2d 1340, 1342 (8th Cir.1974). The determination here that the MCCFA and MSBCC shall bear 20 per cent of plaintiffs' costs is a reasonable one and we, therefore, deny the motion to alter that aspect of the judgment.

Plaintiffs' 380 pages of post-trial motions raise numerous detailed issues, nearly all of which were clearly resolved in the Findings of Fact, Memorandum Opinion or other prior rulings of this Court. One claim, for example, is that the findings are false, resting on fraud and "cover-ups" by the defendants. This was raised before the Special Master and was rejected previously by the Master and by this Court. Nothing has been proffered which would give merit to the claim at this stage of the proceedings.

The central objection raised by plaintiffs relates to the conclusion that the defendant labor organizations do not constitute a single, integrated, political-action organization or quasi-political party. It is asserted that this conclusion rests on a misapplication of the burden of proof, misconstruction of the controlling law, misrepresentation of the record evidence, insufficiently detailed findings and a failure to accept the purportedly "conclusive" opinions of plaintiffs' expert witnesses. Most of these objections are simply an attempt to relitigate the case as a whole, but some clarification may facilitate appellate review of this Court's decision.

The Memorandum Opinion fully sets forth how *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52

L.Ed.2d 261 (1977) controls much of the present case. *See* Mem.Op. at 3–7. A major difficulty in this protracted litigation has been the plaintiffs' consistent refusal to acknowledge *Abood* and its impact here. A crucial distinction in *Abood* is whether an exclusive representative's challenged "political" activities are related or unrelated to collective bargaining—only the latter cannot constitutionally be supported by compulsory fair share fees.[1] Here, however, plaintiffs have repeatedly ignored this distinction and in so doing, have obscured the factual issues and the evidence relating thereto. For example, the plaintiffs offered an expert "content analysis" of selected publications which purportedly showed that from 50–100 per cent of the defendants' activities were "political" and did not involve "collective bargaining." This analysis rested on subjective judgments which in turn were predicated on the assumption that all "organizing, litigation and lobbying" activities were something separate from "collective bargaining." Apart from other flaws in the content analysis, the fundamental error is the refusal to acknowledge that, consistent with the Constitution, certain organizing and lobbying may be related to collective bargaining and may also, in some broad sense, be deemed "political." Accordingly, the content analysis could be afforded little weight in the face of overwhelming record evidence that the MCCFA is not a quasi-political party but rather is a typical public employee bargaining association.

Plaintiffs' refusal to recognize the effect of *Abood* has needlessly consumed extensive resources. *Abood* squarely upheld the constitutionality of exclusive representation bargaining in the public sector, yet plaintiffs have elaborately developed a theory under which such bargaining is unconstitutional unless the public employees' representative is actually some branch of the government. This theory is frivolous in light of *Abood,* but in any case, could have been fully presented in a cogent manner as a legal question turning on largely undisputed facts. Instead, the development of this theory was muddled with plaintiffs' theory that MCCFA, and probably any public sector union, is the constitutional equivalent of a political party, and was further blurred with repeated incantations that the arrangement under PELRA is the functional equivalent of Italian fascism and the National Industrial Recovery Act. Indeed, the presentation of plaintiffs' case has hindered rather than helped the Court to resolve the issues raised in their complaint.

We recognized, however, that important First Amendment interests were implicated and accordingly, placed the burden upon the defendants to establish that they were not quasi-political parties but instead were public employee bargaining organizations whose activities were predominantly related to collective bargaining. Consideration of this issue was unaided by plaintiffs' insistent and exhaustive attempts to construe as unconstitutional virtually all activity which in any sense may be labeled "political." This again reflects an unwillingness to accept the holding of *Abood*.[2] Notwithstand-

1. This case is not a dispute over calculation of fair share fees, nor does it turn on line-drawing as to activities at the margin of what may be characterized as collective bargaining. When plaintiffs' assertions are viewed in their totality, it becomes clear that under their theory, any private bargaining organization will inevitably constitute an impermissible "political action" organization. Throughout this case, plaintiffs' characterization of MCCFA as a "political" organization has included as a predicate those government-related activities which are inherent in public sector bargaining.

2. The plaintiffs' post-trial motions in part reveal, for the first time, a nominal recognition that the issue is not whether the MCCFA is

predominantly "political," however that may be defined, but whether its activities are predominantly related to collective bargaining, as illuminated in *Abood.* Belated recasting of part of its claim, however, does not change the record evidence nor the only conclusion which is supported by the record. Moreover, plaintiffs' adamant resistance to *Abood* is still reflected in the post-trial assertion that this Court erred by finding the MCCFA to be a "non-political" organization. Whatever the proper definition might be for the term "non-political," no one has contended, and we have never found, that the MCCFA is "non-political." Indeed, as the *Abood* Court noted, the core functions of any public sector union can be characterized as inherently political in some sense of that term.

ing this, we closely examined the record as a whole and found that the defendants clearly met their burden. Plaintiffs' contrary assertions at this stage are simply another attempt to litigate matters on which they did not prevail for factual and legal reasons clearly set forth in the Findings of Fact and Memorandum Opinion.

■ The discussion here should remove any doubt as to the Court's resolution of issues which were also addressed by plaintiffs' expert witnesses. Plaintiffs insist that the opinions of organizational science experts, political science experts and political economy experts, when unrebutted by similar experts, must be accepted as binding upon the Court. We disagree. The questions addressed by such experts raise factual and legal issues well within the province of any court. The effect of PELRA on "political equality and state sovereignty," for example, is not a question for binding determination by mechanical rules of science, despite plaintiffs' suggestion to the contrary. Whether PELRA is the functional equivalent of any other piece of legislation is similarly a mixed question of law and fact not subject to supposedly dispositive "scientific" testimony. Nor is a "scientific" analogy to fascism binding upon a court. Plaintiffs also emphasize the expert opinion that the defendants constitute an "integrated" entity. The "integration" issue, however, is not a talisman, as plaintiffs would have us believe. The Findings of Fact clearly show certain affiliations between MCCFA and the other defendants and also show that MCCFA independently charts the collective bargaining course it will pursue. Integration is only relevant as it relates to plaintiffs' contention that the defendants are a monolithic "political action" organization, a claim clearly resolved in favor of the defendants. Here again, plaintiffs contend that the opinion of their political science expert is conclusive on the "political action" characterization, notwithstanding that the primary foundation for

such testimony, like plaintiffs' case as a whole, utterly fails to account for permissible activity which may in some sense be "political" but which also relates to collective bargaining under the principles of *Abood.*

These expert opinions thus are not binding upon the Court and indeed, in most part were not even helpful to resolution of the issues presented. Such opinions were given as much weight as appropriate and the weight of the record as a whole explains why they generally were not accepted.

The motions of plaintiffs and defendants are hereby denied. The request for a hearing on attorneys' fees is also denied as premature. Plaintiffs are directed to submit a written request for such fees and defendants are directed to file any objections they may have to such request within thirty days after it is served upon them. The Court will then consider whether a hearing or further submissions may be necessary to its disposition of any fee questions.

---

Plaintiffs' true objection is to the holding of *Abood* that exclusive representation bargaining in the public sector is constitutional notwithstanding the inherently political dimension of

such activity. Much of the present litigation has been a wasteful attempt to obfuscate and circumvent that clear holding.