# MINNESOTA STATE BOARD FOR COMMUNITY COLLEGES *v.* KNIGHT ET AL.

No. 82–898.   Argued November 1, 1983—Decided February 21, 1984*

---

*Together with No. 82–977, *Minnesota Community College Faculty Association et al.* v. *Knight et al.*, also on appeal from the same court.

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in the judgment, *post*, p. 292. BRENNAN, J., filed a dissenting opinion, *post*, p. 295. STEVENS, J., filed a dissenting opinion, in all but Part III of which BRENNAN, J., joined, and in all but Part II of which POWELL, J., joined, *post*, p. 300.

*Eric R. Miller* argued the cause for appellants. With him on the briefs for appellants in No. 82–977 was *Donald W. Selzer, Jr. Hubert H. Humphrey III*, Attorney General of Minnesota, and *Donald J. Mueting, Sheila S. Fishman*, and *Brad P. Engdahl*, Special Assistant Attorneys General, filed briefs for appellant in No. 82–898.

*Edwin Vieira, Jr.*, argued the cause for appellees. With him on the brief was *Darel F. Swenson.*†

JUSTICE O'CONNOR delivered the opinion of the Court.

The State of Minnesota authorizes its public employees to bargain collectively over terms and conditions of employment. It also requires public employers to engage in official exchanges of views with their professional employees on policy questions relating to employment but outside the scope of mandatory bargaining. If professional employees forming an appropriate bargaining unit have selected an exclusive representative for mandatory bargaining, their employer may exchange views on nonmandatory subjects only with the exclusive representative. The question presented in these cases is whether this restriction on participation in the nonmandatory-subject exchange process violates the constitutional rights of professional employees within the bargaining unit who are not members of the exclusive representative and who may disagree with its views. We hold that it does not.

I

A

In 1971, the Minnesota Legislature adopted the Public Employment Labor Relations Act (PELRA), Minn. Stat. § 179.61 *et seq.* (1982), to establish "orderly and constructive relationships between all public employers and their employees . . . ." § 179.61. The public employers covered by the law are, broadly speaking, the State and its political subdivisions, agencies, and instrumentalities. § 179.63. In its amended form, as in its original form, PELRA provides for

---

†*J. Albert Woll, Marsha S. Berzon,* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

*Ann H. Franke, Lawrence White,* and *Ralph S. Spritzer* filed a brief for the American Association of University Professors as *amicus curiae.*

the division of public employees into appropriate bargaining units and establishes a procedure, based on majority support within a unit, for the designation of an exclusive bargaining agent for that unit. §§ 179.67, 179.71, 179.741. The statute requires public employers to "meet and negotiate" with exclusive representatives concerning the "terms and conditions of employment," which the statute defines to mean "the hours of employment, the compensation therefor . . . , and the employer's personnel policies affecting the working conditions of the employees." §§ 179.63, 179.67, 179.71. The employer's and employees' representatives must seek an agreement in good faith. § 179.63, subd. 16.

PELRA also grants professional employees, such as college faculty, the right to "meet and confer" with their employers on matters related to employment that are outside the scope of mandatory negotiations. §§ 179.63, 179.65. This provision rests on the recognition that "professional employees possess knowledge, expertise, and dedication which is helpful and necessary to the operation and quality of public services and which may assist public employers in developing their policies." § 179.73. The statute declares it to be the State's policy to "encourage close cooperation between public employers and professional employees" by providing for "meet and confer" sessions on all employment-related questions not subject to mandatory bargaining. *Ibid.* There is no statutory provision concerning the "meet and confer" process, however, that requires good-faith efforts to reach agreement. See *Minneapolis Federation of Teachers Local 59* v. *Minneapolis Special School Dist. No. 1,* 258 N. W. 2d 802, 804, n. 2 (Minn. 1977).

PELRA requires professional employees to select a representative to "meet and confer" with their public employer. Minn. Stat. § 179.73 (1982). If professional employees in an appropriate bargaining unit have an exclusive representative to "meet and negotiate" with their employer, that representative serves as the "meet and confer" representative as well.

Indeed, the employer may neither "meet and negotiate" nor "meet and confer" with any members of that bargaining unit except through their exclusive representative. § 179.66, subd. 7. This restriction, however, does not prevent professional employees from submitting advice or recommendations to their employer as part of their work assignment. *Ibid.* Moreover, nothing in PELRA restricts the right of any public employee to speak on any "matter related to the conditions or compensation of public employment or their betterment" as long as doing so "is not designed to and does not interfere with the full faithful and proper performance of the duties of employment or circumvent the rights of the exclusive representative if there be one." § 179.65, subd. 1.

## B

Appellant Minnesota State Board for Community Colleges (State Board) operates the Minnesota community college system. At the time of trial, the system comprised 18 institutions located throughout the State. Each community college is administered by a president, who reports, through the chancellor of the system, to the State Board.

Prior to 1971, Minnesota's community colleges were governed in a variety of ways. On some campuses, faculty had a strong voice in administrative policymaking, expressed through organizations such as faculty senates. On other campuses, the administration consulted very little with the faculty. Irrespective of the level of faculty involvement in governance, however, the administrations of the colleges retained final authority to make policy.

Following enactment of PELRA, appellant Minnesota Community College Faculty Association (MCCFA)[1] was designated the exclusive representative of the faculty of the

---

[1] MCCFA is affiliated with the Minnesota Education Association (MEA) and the National Education Association (NEA), also appellants in these cases.

State's community colleges, which had been deemed a single bargaining unit.[2]  MCCFA has "met and negotiated" and "met and conferred" with the State Board since 1971.  The result has been the negotiation of successive collective-bargaining agreements in the intervening years and, in order to implement the "meet and confer" provision, a restructuring of governance practices in the community college system.

On the state level, MCCFA and the Board established "meet and confer" committees to discuss questions of policy applicable to the entire system.  On the campus level, the MCCFA chapters and the college administrations created local "meet and confer" committees—also referred to as "exchange of views" committees—to discuss questions of policy applicable only to the campus.  The committees on both levels have discussed such topics as the selection and evaluation of administrators, academic accreditation, student affairs, curriculum, and fiscal planning—all policy matters within the control of the college administrations and the State Board.  App. to Juris. Statement A–49.

The State Board considers the views expressed by the statewide faculty "meet and confer" committees to be the faculty's official collective position.  It recognizes, however, that not every instructor agrees with the official faculty view on every policy question.  Not every instructor in the bargaining unit is a member of MCCFA, and MCCFA has selected only its own members to represent it on "meet and confer" committees.  Accordingly, all faculty have been free to communicate to the State Board and to local administrations their views on questions within the coverage of the statutory "meet and confer" provision.  *Id.*, at A–50, A–52.  They have frequently done so.[3]  With the possible exception

---

[2] Since 1980, the "community college instructional unit" has been defined by statute.  Minn. Stat. § 179.741 (1982).

[3] Indeed, both the Board and the local administrations have regularly made efforts to supplement the "official" advice with other, unofficial communications.  Prior to each on-campus Board meeting, the Board has made itself available to persons who wish to express their views individ-

of a brief period of adjustment to the new governance structure, during which some administrators were reluctant to communicate informally with faculty, individual faculty members have not been impeded by either MCCFA or college administrators in the communication of their views on policy questions. *Id.*, at A–50. Nor has PELRA ever been construed to impede such communication.[4]

---

ually or in groups. In addition, many faculty members have met with or written to the Board or the system's chancellor to communicate their individual views. On the local level, college presidents have used a variety of means to solicit opinions from their instructors and students, including making themselves available at collegewide "town meetings" or at commons areas, hosting luncheons and breakfasts, appearing at faculty meetings, and inviting faculty advice through maintenance of an "open-door" policy. See App. A–57, A–61 to A–64, A–83 to A–84, A–99 to A–103. Thus, while the "meet and confer" process gives weight to an official collective faculty position as formulated by the faculty's exclusive representative, all instructors have ample opportunity to express their views to their employer on subjects within the purview of the "meet and confer" process.

[4] The repeated suggestions in JUSTICE STEVENS' dissent that the state employer and state employees have been prohibited or deterred by the statute from talking with each other on policy questions, *e. g.*, *post*, at 302–307, 310–311, 312, 322, misunderstand the statute and are flatly contradicted by the District Court's findings. All that the statute prohibits is the formal exchange of views called a "meet and confer" session. It in no way impairs the ability of individual employees or groups of employees to express their views to their employer outside that formal context, and there has been no suggestion in these cases that, after an initial period of adjustment to PELRA, any such communication of views has ever been restrained because it was challenged as constituting a formal "meet and confer" session. None of the testimony selectively quoted by JUSTICE STEVENS' dissent recites a single instance of such restraint, and the quoted passages make clear that the prohibition on the employer's holding "meet and confer" sessions with anyone but the exclusive representative has been understood to bar only a certain type of formal exchange, not other exchanges of views. *E. g.*, *post*, at 305, n. 6, 307, n. 9.

Indeed, the District Court made the following findings of fact: "[A]ll faculty have the right to informally communicate their individual views to administrators and [the State Board] and MCCFA have never attempted to deny or abridge such rights." App. to Juris. Statement A–50. "The right of all faculty, both members and nonmembers of MCCFA, to communicate

### C

Appellees are 20 Minnesota community college faculty instructors who are not members of MCCFA. In December 1974, they filed suit in the United States District Court for the District of Minnesota, challenging the constitutionality of MCCFA's exclusive representation of community college faculty in both the "meet and negotiate" and "meet and confer" processes. A three-judge District Court was convened to hear the case. A Special Master appointed by the court conducted the trial in 1980 and submitted recommended findings of fact in early 1981. *Id.*, at A–54 to A–81. The three-judge District Court issued its findings of fact in late 1981, *id.*, at A–32 to A–54, and its decision on the legal claims in early 1982, 571 F. Supp. 1.

The court rejected appellees' attack on the constitutionality of exclusive representation in bargaining over terms and conditions of employment, relying chiefly on *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977). The court agreed with appellees, however, that PELRA, as applied in the community college system, infringes First and Fourteenth Amendment speech and associational rights of faculty who

---

informally and individually with administrative officials has not been impaired . . . ." *Id.*, at A–52. "The plaintiffs have failed to demonstrate any direct, indirect, actual or potential impairment of their associational and free speech rights, except as indicated in [three findings]." *Ibid.* Those findings were that plaintiffs are impaired in their ability to participate in the "meet and confer" process by their nonmembership in MCCFA, that some plaintiffs felt pressure to join MCCFA because of this reduced opportunity to participate in the "meet and confer" process, and that free speech contrary to MCCFA positions could potentially be chilled by MCCFA's authority to select "meet and confer" representatives. *Id.*, at A–51 to A–52. "The plaintiffs have not demonstrated," however, "that any faculty member's exercise of free speech has been impaired in practice by virtue of this potential inhibition." *Id.*, at A–52. In short, the District Court found that the only restriction on asserted speech rights was the restriction on the opportunity of nonmembers of MCCFA to participate in "meet and confer" sessions.

do not wish to join MCCFA. By granting MCCFA the right to select the faculty representatives for the "meet and confer" committees and by permitting MCCFA to select only its own members, the court held, PELRA unconstitutionally deprives non-MCCFA instructors of "a fair opportunity to participate in the selection of governance representatives." 571 F. Supp., at 10. The court granted declaratory relief in accordance with its holdings and enjoined MCCFA from selecting "meet and confer" representatives without providing all faculty the fair opportunity that its selection practice had unconstitutionally denied.

Appellees, the State Board, and MCCFA all filed appeals with this Court, invoking jurisdiction under 28 U. S. C. § 1253. The Court summarily affirmed the judgment insofar as the District Court held the "meet and negotiate" provisions of PELRA to be valid. *Knight* v. *Minnesota Community College Faculty Assn.*, 460 U. S. 1048 (1983). The Court thus rejected appellees' argument, based on *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 (1935), and on *Carter* v. *Carter Coal Co.*, 298 U. S. 238 (1936), that PELRA unconstitutionally delegated legislative authority to private parties. The Court's summary affirmance also rejected the constitutional attack on PELRA's restriction to the exclusive representative of participation in the "meet and negotiate" process.

On March 28, 1983, the Court noted probable jurisdiction in the appeals by the Board and MCCFA. 460 U. S. 1050. Several weeks later, following an election held pursuant to a newly established scheme for selecting "meet and confer" representatives, the three-judge District Court modified its injunction to require a specific voting system for the selection of faculty "meet and confer" representatives.[5] This Court

---

[5] The Board and MCCFA established a new process for selecting "meet and confer" representatives and held the prescribed election before this Court noted probable jurisdiction. The new process allowed each faculty member to nominate candidates, to run for election, and to vote for each vacancy on both state and local committees. For a voter's ballot to be

permitted appellants to add to their appeal a challenge to this new relief. 462 U. S. 1104 (1983). We now reverse the District Court's holding that the "meet and confer" provisions of PELRA deprive appellees of their constitutional rights.

## II

### A

Appellees do not and could not claim that they have been unconstitutionally denied access to a public forum. A "meet and confer" session is obviously not a public forum. It is a fundamental principle of First Amendment doctrine, articulated most recently in *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45–46 (1983), that for government property to be a public forum, it must by long tradition or by government designation be open to the public at large for assembly and speech. Minnesota college administration meetings convened to obtain faculty advice on policy questions have neither by long tradition nor by government designation been open for general public participation. The District Court did not so find, 571 F. Supp., at 9, and appellees do not contend otherwise.

---

counted, though, the voter had to cast votes for as many candidates as there were slots to be filled. Only MCCFA members ran for the statewide committees. At the local level, several non-MCCFA instructors ran for office, and MCCFA ran slates of candidates at each institution. Only MCCFA members were elected.

Upon appellees' motion for further relief, the District Court ruled that the new selection scheme failed to provide appellees "the opportunity to participate meaningfully in the meet and confer process." App. A–192. The court ordered that new elections be conducted using a cumulative voting system, under which voters could concentrate their multiple votes on a particular candidate, thereby enhancing the possibility that a non-MCCFA candidate would be elected.

Appellants challenge the District Court's modified order of relief separate and apart from its holding that PELRA is unconstitutional as applied. In light of our disposition on the issue of PELRA's constitutionality, we need not address the validity of the District Court's remedy.

The rights at issue in these cases are accordingly wholly unlike those at stake in *Madison Joint School District No. 8* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167 (1976). The Court in that case upheld a claim of access to a public forum, applying standard public-forum First Amendment analysis. See *Perry Education Assn.* v. *Perry Local Educators' Assn.*, *supra*, at 45 (citing *Madison Joint School District* as an example of a case involving a "forum generally open to the public" for expressive activity). The school board meetings at issue there were "opened [as] a forum for direct citizen involvement," 429 U. S., at 175, and "public participation [was] permitted," *id.*, at 169. The First Amendment was violated when the meetings were suddenly closed to one segment of the public even though they otherwise remained open for participation by the public at large.[6] These cases, by contrast, involve no selective closure of a generally open forum, and hence any reliance on the *Madison* case would be misplaced.

Indeed, the claim in these cases is not even a claim of access to a *nonpublic* forum, such as the school mail system at issue in *Perry Education Assn.* A private organization

---

[6] JUSTICE STEVENS' dissent suggests that somehow the Constitution itself opened the school board meeting as a public forum. *Post*, at 319, n. 28. To the extent that the suggestion is that something other than government designation or long tradition can make government property a public forum, it is a radical departure from elementary First Amendment doctrine. JUSTICE STEVENS offers no indication of what he would substitute for the current test.

JUSTICE STEVENS' dissent also states that the First Amendment prohibits "the exclusion of persons from access to the organs of government based on [a] desire to give one side a monopoly in expressing its views." *Ibid.* Presumably, the President and every other public official and governmental body would be required to select the group they listen to on policy questions without regard to viewpoint. The suggestion is discussed at greater length *infra*, at 283–285, but merely to state it is to see that it has shocking implications for our political system wholly unsupported by anything this Court has ever held.

there claimed a right of access to government property for use in speaking to potentially willing listeners among a group of private individuals and public officials not acting in an official capacity. The organization claimed no right to have anyone, public or private, attend to its message. See also *United States Postal Service* v. *Greenburgh Civic Assns.*, 453 U. S. 114 (1981) (postal letterbox); *Greer* v. *Spock*, 424 U. S. 828 (1976) (military base); *Lehman* v. *City of Shaker Heights*, 418 U. S. 298 (1974) (advertising space on municipal bus); *Adderley* v. *Florida*, 385 U. S. 39 (1966) (county jail). Appellees here make a claim quite different from those made in the nonpublic-forum cases. They do not contend that certain government property has been closed to them for use in communicating with private individuals or public officials not acting as such who might be willing to listen to them. Rather, they claim an entitlement to a government audience for their views.

"Meet and confer" sessions are occasions for public employers, acting solely as instrumentalities of the State, to receive policy advice from their professional employees. Minnesota has simply restricted the class of persons to whom it will listen in its making of policy. Thus, appellees' principal claim is that they have a right to force officers of the State acting in an official policymaking capacity to listen to them in a particular formal setting.[7] The nonpublic-forum cases concern government's authority to provide assistance to certain persons in communicating with other persons who would not, as listeners, be acting for the government. As the discussion below makes clear, the claim that government is constitutionally obliged to listen to appellees involves entirely different considerations from those on which resolution of nonpublic-forum cases turn. Hence, the nonpublic-forum cases are

---

[7] Even supposing that a state official acting on behalf of the State in a policymaking capacity could raise a First Amendment objection to the State's instructions concerning how he conducted his official activity, there is no such claim in these cases. Moreover, appellees have no standing to raise any such claim on behalf of community college administrators.

largely irrelevant to assessing appellees' novel constitutional claim.[8]

The District Court agreed with appellees' claim to the extent that it was limited to faculty participation in governance of institutions of higher education. The court reasoned that "issues in higher education have a special character." 571 F. Supp., at 8. Tradition and public policy support the right of faculty to participate in policymaking in higher education, the court stated, and the "right of expression by faculty members also holds a special place under our Constitution." *Id.*, at 8–9. Because of the "vital concern for academic freedom," the District Court concluded, "when the state compels creation of a representative governance system in higher education and utilizes that forum for ongoing debate and resolution of virtually all issues outside the scope of collective bargaining, it must afford every faculty member a fair opportunity to participate in the selection of governance representatives." *Id.*, at 9–10.

This conclusion is erroneous. Appellees have no constitutional right to force the government to listen to their views. They have no such right as members of the public, as government employees, or as instructors in an institution of higher education.

1

The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy. In *Bi-Metallic Investment Co.* v. *State Board of Equalization*, 239 U. S. 441 (1915), this Court rejected a claim to such a right founded on the Due Process

---

[8] *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972), is an equal protection version of a nonpublic-forum case. The plaintiffs in *Mosley* sought access to government property for use in communicating to potentially willing listeners among a group of private individuals or public officials not acting in an official capacity. It has no more relevance to the claim of appellees in these cases than do the First Amendment nonpublic-forum cases.

Clause of the Fourteenth Amendment. Speaking for the Court, Justice Holmes explained:

> "Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Id.*, at 445.

In *Madison Joint School District No. 8* v. *Wisconsin Employment Relations Comm'n*, which sustained a First Amendment challenge to a restriction on access to a public forum, the Court recognized the soundness of Justice Holmes' reasoning outside the due process context. The Court stated: "Plainly, public bodies may confine their meetings to specified subject matter and may hold nonpublic sessions to transact business." 429 U. S., at 175, n. 8.

Policymaking organs in our system of government have never operated under a constitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted. Legislatures throughout the Nation, including Congress, frequently enact bills on which no hearings have been held or on which testimony has been received from only a select group. Executive agencies likewise make policy decisions of widespread application without permitting unrestricted public testimony. Public officials at all levels of government daily make policy decisions based only on the advice they decide they need and choose to hear. To recognize a constitutional right to participate directly in government policymaking would work a revolution in existing government practices.

Not least among the reasons for refusing to recognize such a right is the impossibility of its judicial definition and enforcement. Both federalism and separation-of-powers concerns would be implicated in the massive intrusion into state and federal policymaking that recognition of the claimed right would entail. Moreover, the pragmatic considerations identified by Justice Holmes in *Bi-Metallic Investment Co.* v. *State Board of Equalization, supra,* are as weighty today as they were in 1915. Government makes so many policy decisions affecting so many people that it would likely grind to a halt were policymaking constrained by constitutional requirements on whose voices must be heard. "There must be a limit to individual argument in such matters if government is to go on." *Id.,* at 445. Absent statutory restrictions, the State must be free to consult or not to consult whomever it pleases.

However wise or practicable various levels of public participation in various kinds of policy decisions may be, this Court has never held, and nothing in the Constitution suggests it should hold, that government must provide for such participation. In *Bi-Metallic* the Court rejected due process as a source of an obligation to listen. Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues. Indeed, in *Smith* v. *Arkansas State Highway Employees,* 441 U. S. 463, 464–466 (1979), the Court rejected the suggestion. No other constitutional provision has been advanced as a source of such a requirement. Nor, finally, can the structure of government established and approved by the Constitution provide the source. It is inherent in a republican form of government that direct public participation in government policymaking is limited. See The Federalist No. 10 (J. Madison). Disagreement with public policy and disapproval of officials' responsiveness, as Justice Holmes suggested in *Bi-Metallic, supra,* is to be registered principally at the polls.

2

Appellees thus have no constitutional right as members of the public to a government audience for their policy views. As public employees, of course, they have a special interest in public policies relating to their employment. Minnesota's statutory scheme for public-employment labor relations recognizes as much. Appellees' status as public employees, however, gives them no special constitutional right to a voice in the making of policy by their government employer.

In *Smith* v. *Arkansas State Highway Employees, supra,* a public employees' union argued that its First Amendment rights were abridged because the public employer required employees' grievances to be filed directly with the employer and refused to recognize the union's communications concerning its members' grievances. The Court rejected the argument.

> "The public employee surely can associate, and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so. See *Pickering* v. *Board of Education*, 391 U. S. 563, 574–575 (1968); *Shelton* v. *Tucker,* 364 U. S. 479 (1960). But the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it." *Id.,* at 465 (footnote omitted).

The Court acknowledged that "[t]he First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances." *Id.,* at 464. The government had not infringed any of those rights, the Court concluded. "[A]ll that the [government] has done in its challenged conduct is simply to ignore the union. That it is free to do." *Id.,* at 466.

The conduct challenged here is the converse of that challenged in *Smith.* There the government listened only to

individual employees and not to the union. Here the government "meets and confers" with the union and not with individual employees. The applicable constitutional principles are identical to those that controlled in *Smith*.[9] When government makes general policy, it is under no greater constitutional obligation to listen to any specially affected class than it is to listen to the public at large.

### 3

The academic setting of the policymaking at issue in these cases does not alter this conclusion. To be sure, there is a strong, if not universal or uniform, tradition of faculty participation in school governance, and there are numerous policy arguments to support such participation. See American Association for Higher Education—National Education Association, Faculty Participation in Academic Governance (1967); Brief for American Association of University Professors as *Amicus Curiae* 3–10. But this Court has never recognized a constitutional right of faculty to participate in policymaking in academic institutions.

In several cases the Court has recognized that infringement of the rights of speech and association guaranteed by the First and Fourteenth Amendments " 'in the case of teachers brings the safeguards of those amendments vividly into operation.' " *Shelton* v. *Tucker*, 364 U. S. 479, 487 (1960) (quoting *Wieman* v. *Updegraff*, 344 U. S. 183, 195 (1952) (Frankfurter, J., concurring)). Those cases, however, involved individuals' rights to express their views and to associate with others for communicative purposes. See, *e. g.*, *Keyishian* v. *Board of Regents of University of New York*, 385 U. S. 589 (1967); *Shelton* v. *Tucker, supra; Sweezy* v. *New Hampshire*, 354 U. S. 234 (1957). These rights do not entail any government obligation to listen. *Smith* v. *Arkan-*

---

[9] Although an individual employee may have certain due process rights that a union does not have, these cases involve no claimed deprivation of life, liberty, or property without due process.

*sas State Highway Employees*, 441 U. S. 463 (1979). Even assuming that speech rights guaranteed by the First Amendment take on a special meaning in an academic setting, they do not require government to allow teachers employed by it to participate in institutional policymaking. Faculty involvement in academic governance has much to recommend it as a matter of academic policy, but it finds no basis in the Constitution.

## B

Although there is no constitutional right to participate in academic governance, the First Amendment guarantees the right both to speak and to associate. Appellees' speech and associational rights, however, have not been infringed by Minnesota's restriction of participation in "meet and confer" sessions to the faculty's exclusive representative. The State has in no way restrained appellees' freedom to speak on any education-related issue or their freedom to associate or not to associate with whom they please, including the exclusive representative. Nor has the State attempted to suppress any ideas.

It is doubtless true that the unique status of the exclusive representative in the "meet and confer" process amplifies its voice in the policymaking process. But that amplification no more impairs individual instructors' constitutional freedom to speak than the amplification of individual voices impaired the union's freedom to speak in *Smith* v. *Arkansas State Highway Employees, supra.* Moreover, the exclusive representative's unique role in "meet and negotiate" sessions amplifies its voice as much as its unique role in "meet and confer" sessions, yet the Court summarily affirmed the District Court's approval of that role in these cases. Amplification of the sort claimed is inherent in government's freedom to choose its advisers. A person's right to speak is not infringed when government simply ignores that person while listening to others.[10]

---

[10] JUSTICE STEVENS' discussion of the right to "a *meaningful* opportunity to express one's views" and of First Amendment associational rights is be-

Nor is appellees' right to speak infringed by the ability of MCCFA to "retaliate" for protected speech, as the District Court put it, by refusing to appoint them to the "meet and confer" committees. The State of Minnesota seeks to obtain MCCFA's views on policy questions, and MCCFA has simply chosen representatives who share its views on the issues to be discussed with the State. MCCFA's ability to "retaliate" by not selecting those who dissent from its views no more unconstitutionally inhibits appellees' speech than voters' power to reject a candidate for office inhibits the candidate's speech. See *Branti* v. *Finkel*, 445 U. S. 507, 533 (1980) (POWELL, J., dissenting).

Similarly, appellees' associational freedom has not been impaired. Appellees are free to form whatever advocacy groups they like. They are not required to become members of MCCFA, and they do not challenge the monetary contribution they are required to make to support MCCFA's representation activities.[11] Appellees may well feel some pressure

---

side the point. *Post*, at 308–314. Such rights, whatever their scope, entail no government obligation to listen, and that is what is claimed by appellees. *Smith* v. *Arkansas State Highway Employees*, 441 U. S. 463, 464–466 (1979). None of the cases cited by JUSTICE STEVENS even considers, let alone supports, a right to be heard by the government on policy questions.

In particular, *Healy* v. *James*, 408 U. S. 169 (1972), concerns a group's claim of access to a forum to use in communicating among themselves and with other potentially willing listeners. As pointed out *supra*, at 280–283, these cases involve no such claim to a forum. Rather, appellees claim a right to be listened to by persons acting solely in their capacity as representatives of the State. *Healy* is therefore utterly irrelevant to the validity of appellees' claim.

[11] Under PELRA, public employees are not required to join the organization that acts as their exclusive representative. Minn. Stat. § 179.65, subd. 2 (1982). Nonmembers may, however, be required to pay a fairshare fee to the exclusive representative to cover costs related to negotiating on behalf of the entire bargaining unit. *Ibid.* This requirement is not at issue in this lawsuit, although it is subject to certain constitutional constraints. See *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 217–237 (1977) (mandatory contributions valid if for bargaining, administration,

to join the exclusive representative in order to give them the opportunity to serve on the "meet and confer" committees or to give them a voice in the representative's adoption of positions on particular issues. That pressure, however, is no different from the pressure they may feel to join MCCFA because of its unique status in the "meet and negotiate" process, a status the Court has summarily approved. Moreover, the pressure is no different from the pressure to join a majority party that persons in the minority always feel. Such pressure is inherent in our system of government; it does not create an unconstitutional inhibition on associational freedom.[12]

---

and grievance activities of exclusive representative but not if for other, ideological activities).

[12] JUSTICE STEVENS quotes certain of the District Court's findings as if to suggest that they undercut our holding. *Post*, at 308. The suggestion is meritless. The finding that "the weight and significance of individual speech interests have been consciously derogated in favor of systematic, official expression," 571 F. Supp. 1, 8 (1982), is merely one way of saying that the State of Minnesota, as a deliberate policy matter, is committed to listening to the exclusive representative on public employer policy questions. Moreover, it is perfectly true, and perfectly unobjectionable, that "the primary mechanism for any significant faculty-administration communication on . . . policy questions," App. to Juris. Statement A–49, is the "meet and confer" process. It is likewise obvious and of no legal consequence that the "meet and confer" process "is the only significant forum for the faculty to resolve virtually every issue outside the scope of mandatory bargaining." 571 F. Supp., at 9.

The last statement quoted by JUSTICE STEVENS draws a general conclusion about PELRA: "This structure effectively blocks any meaningful expression by faculty members who are excluded from the formal process." *Ibid.* Given that it appears in the midst of the District Court's analysis and not with its findings of fact, the statement was probably intended, and in any case is most sensibly read, as a mixed statement of law and fact, depending for its truth on a definition of "meaningful" that must be based on legal principles. However the statement is read, though, appellees have no constitutional right to be heard on policy questions, and their speech and associational freedoms have been wholly unimpaired.

## C

Unable to demonstrate an infringement of any First Amendment right, appellees contend that their exclusion from "meet and confer" sessions denies them equal protection of the laws in violation of the Fourteenth Amendment. This final argument is meritless. The interest of appellees that is affected—the interest in a government audience for their policy views—finds no special protection in the Constitution. There being no other reason to invoke heightened scrutiny, the challenged state action "need only rationally further a legitimate state purpose" to be valid under the Equal Protection Clause. *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S., at 54. PELRA certainly meets that standard. The State has a legitimate interest in ensuring that its public employers hear one, and only one, voice presenting the majority view of its professional employees on employment-related policy questions, whatever other advice they may receive on those questions. Permitting selection of the "meet and confer" representatives to be made by the exclusive representative, which has its unique status by virtue of majority support within the bargaining unit, is a rational means of serving that interest.

If it is rational for the State to give the exclusive representative a unique role in the "meet and negotiate" process, as the summary affirmance in appellees' appeal in this litigation presupposes, it is rational for the State to do the same in the "meet and confer" process. The goal of reaching agreement makes it imperative for an employer to have before it only one collective view of its employees when "negotiating." See *Abood* v. *Detroit Board of Education*, 431 U. S., at 224.[13]

---

[13] *Abood* held that employees may not be compelled to support a union's ideological activities unrelated to collective bargaining. The basis for the holding that associational rights were infringed was the compulsory collection of dues from dissenting employees. 431 U. S., at 232–237. Contrary to the suggestion of JUSTICE STEVENS' dissent, see *post*, at 316, 321–322, *Abood* did not even discuss, let alone adopt, any general bar on "exclusiv-

Similarly, the goal of basing policy decisions on consideration of the majority view of its employees makes it reasonable for an employer to give only the exclusive representative a particular formal setting in which to offer advice on policy. Appellees' equal protection challenge accordingly fails.

### III

The District Court erred in holding that appellees had been unconstitutionally denied an opportunity to participate in their public employer's making of policy. Whatever the wisdom of Minnesota's statutory scheme for professional employee consultation on employment-related policy, in academic or other settings, the scheme violates no provision of the Constitution. The judgment of the District Court is therefore

*Reversed.*

JUSTICE MARSHALL, concurring in the judgment.

I do not agree with the majority's sweeping assertion that no government official is ever constitutionally obliged, before making a decision on a matter of public policy, to afford interested citizens an opportunity to present their views. *Ante,* at 283–285. Nor do I agree with JUSTICE STEVENS that the First Amendment always—or even often—requires that government decisions be made in "an open marketplace of ideas." See *post,* at 300, 314. Rather, I think that the constitutional authority of a government decisionmaker to choose the persons to whom he will and will not listen prior to making a decision varies with the nature of the decision at issue and the institutional environment in which it must be made. Cf. *Healy* v. *James,* 408 U. S. 169, 180 (1972) ("First Amendment rights must always be applied 'in light of the special

---

ity" outside the collective-bargaining context. Of course, these cases involve no claim that anyone is being compelled to support MCCFA's activities. See n. 11, *supra.*

characteristics of the . . . environment' in the particular case") (quoting *Tinker* v. *Des Moines Independent School District*, 393 U. S. 503, 506 (1969)). The narrow question presented in these cases is the constitutional validity of a peculiar set of constraints on consultation between administrators and members of the faculties of state colleges; it can be sensibly resolved only by attending to the distinctive characteristics and needs of public institutions of higher education.

We have frequently affirmed that "the intellectual give and take of campus debate" is entitled to constitutional protection. *E. g.*, *Healy* v. *James*, 408 U. S., at 181–182. Accordingly, we have been solicitous of the rights of students in public colleges to organize themselves into voluntary associations, see *id.*, at 180–184; of the rights of student organizations to make use of college facilities, see *Widmar* v. *Vincent*, 454 U. S. 263, 267–270, and n. 5 (1981); and of the rights of faculty members to espouse unpopular ideas or to join controversial organizations without fear of discharge or retaliation, see *Keyishian* v. *Board of Regents of University of New York*, 385 U. S. 589, 601–603, 607–608 (1967); *Shelton* v. *Tucker*, 364 U. S. 479, 485–487 (1960). In an appropriate case, I would be prepared to include within this collection of constitutionally protected avenues of communication a measure of freedom on the part of faculty members (as well as students) to present to college administrators their ideas on matters of importance to the mission of the academic community. Such freedom is essential if all members of the community are to participate meaningfully in the determination of the goals of the institution and the choice of means to achieve them. Such participation is, in turn, essential if our academic institutions are to fulfill their dual responsibility to advance the frontiers of knowledge through unfettered inquiry and debate, see *Sweezy* v. *New Hampshire*, 354 U. S. 234, 250 (1957), and to produce a citizenry willing and able to involve itself in the governance of the polity, see *id.*,

at 250–251; see also *Keyishian* v. *Board of Regents, supra,* at 603.

In determining whether a given constraint on the ability of faculty members to communicate with administrators runs afoul of the Constitution, it seems to me proper to consider not only the asserted justification but also the source of the constraint. As JUSTICE STEVENS suggests, see *post,* at 300, 313–314, 322–323, there are good reasons to be more suspicious when a state legislature instructs college administrators to listen to some faculty members but not others than when administrators decide on their own to listen to some faculty members but not others. Administrators are more accountable to slighted faculty members than are state legislators.* Moreover, our solicitude for the rights of unpopular members of academic communities and our desire to keep open the channels of communication within those communities, see *supra,* at 293, should not blind us to the fact that, in general, colleges and universities are most likely to fulfill their crucial roles in our society if they are allowed to operate free of outside interference. See *University of California Regents* v. *Bakke,* 438 U. S. 265, 312 (1978) (opinion of POWELL, J.); *Sweezy* v. *New Hampshire, supra,* at 262–263 (Frankfurter, J., concurring in result). That insight should prompt us to defer to the judgment of college administrators—persons we presume to be knowledgable and to have the best interests of their institutions at heart—in circumstances in which we

---

*Cf. *Bi-Metallic Investment Co.* v. *State Board of Equalization,* 239 U. S. 441, 445 (1915) (contending that property owners in Denver, who were adversely affected by a State Board of Equalization ruling, "are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule"). At least in the context of decisions affecting public colleges and universities, I agree with JUSTICE STEVENS' suggestion that, when the "power" posited by the Court in *Bi-Metallic* becomes too "remote," the First Amendment warrants the establishment of a right on the part of the affected persons to present their views to the decisionmakers, as an alternative check on the choices made.

would not defer to the judgment of government officials who seek to regulate the affairs of the academy.

The difficult tasks of giving shape to these First Amendment rights and of assessing the state interests that might justify their abridgment can, however, be left to another day, because the proofs in these cases do not establish the kind of impairment of the ability of faculty members to communicate with administrators that would, in my view, give rise to constitutional difficulty. As the majority observes, there remains substantial opportunity, outside the formal "meet and confer" sessions, for administrators and faculty members in Minnesota community colleges to exchange ideas on a wide variety of topics. See *ante*, at 276–277, and nn. 3, 4. This is not to say that all faculty members have equal access to the most effective media for communicating with the administration; the findings of the District Court make plain that the representatives of the MCCFA enjoy greater freedom to express their views than appellees. See 571 F. Supp. 1, 8 (1982). But the Constitution does not require college administrators to give "equal time" to all persons competing for their attention. No more can legitimately be expected than that all members of the academic community be afforded a meaningful opportunity to make themselves heard. In my view, appellees have failed to show that the PELRA denies them that opportunity.

For the foregoing reasons, I concur in the judgment of the Court but not its opinion.

JUSTICE BRENNAN, dissenting.

Although I agree with much of JUSTICE STEVENS' dissent, I write separately to explain why, irrespective of other grounds, principles of academic freedom require affirmance of the District Court's holding that the "meet and confer" provisions deprive appellees of their constitutional rights.

It is crucial at the outset to recognize that two related First Amendment interests are at stake here. On the one

hand, those faculty members who are barred from participation in "meet and confer" sessions by virtue of their refusal to join MCCFA have a First Amendment right to express their views on important matters of academic governance to college administrators.[1]  At the same time, they enjoy a First Amendment right to be free from compelled associations with positions or views that they do not espouse.  In my view, the real vice of the Minnesota Public Employment Labor Relations Act (PELRA) is that it impermissibly forces nonunion faculty members to choose between these two rights.

The first right is rooted in our common understanding that the First Amendment safeguards the free exchange of ideas at institutions of higher learning.  This Court's decisions acknowledge unequivocally that academic freedom is "a special concern of the First Amendment," *Keyishian* v. *Board of Regents of University of New York*, 385 U. S. 589, 603 (1967), and that protecting the free exchange of ideas within our schools is of profound importance in promoting an open society.  See, *e. g., Healy* v. *James*, 408 U. S. 169, 180–181 (1972); *Shelton* v. *Tucker*, 364 U. S. 479, 487 (1960); *Sweezy* v. *New Hampshire*, 354 U. S. 234, 250 (1957).  Recognizing that in our society "[t]he classroom is peculiarly the 'marketplace of ideas,'" *Keyishian* v. *Board of Regents*, 385 U. S., at 603, we have not hesitated to strike down laws that effectively inhibit the free discussion of novel or controversial ideas, see, *e. g., ibid.; Shelton* v. *Tucker, supra,* or that directly prohibit the teaching of unpopular subject matter. *Epperson* v. *Arkansas*, 393 U. S. 97, 107 (1968).  This First Amendment freedom to explore novel or controversial ideas

---

[1] In this respect, I agree with JUSTICE MARSHALL's suggestion that the First Amendment protects the freedom of "faculty members . . . to present to college administrators their ideas on matters of importance to the mission of the academic community," *ante,* at 293; I disagree, however, with his view that the sporadic and informal opportunities of nonunion faculty to exchange ideas with college administrators outside the "meet and confer" context provide a sufficient guarantee that this First Amendment freedom has been fully respected.  See *infra,* at 298, and n. 2.

in the classroom is closely linked to the freedom of faculty members to express their views to the administration concerning matters of academic governance. If the First Amendment is truly to protect the "free play of the spirit" within our institutions of higher learning, *Shelton* v. *Tucker, supra,* at 487, then the faculty at those institutions must be able to participate effectively in the discussion of such matters as, for example, curriculum reform, degree requirements, student affairs, new facilities, and budgetary planning. The freedom to teach without inhibition may be jeopardized just as gravely by a restriction on the faculty's ability to speak out on such matters as by the more direct restrictions struck down in *Keyishian* and in *Epperson.* In my view, therefore, a direct prohibition of some identified faculty group from submitting their views concerning academic policy questions for consideration by college administrators would plainly violate the principles of academic freedom enshrined in the First Amendment.

The basis of the second right—the right to be free from compelled associations—is found in our conviction that individuals may not be forced to join or support positions or views which they find objectionable on moral, ideological, or personal grounds. See, *e. g., Abood* v. *Detroit Board of Education,* 431 U. S. 209, 234–236 (1977); *Wooley* v. *Maynard,* 430 U. S. 705, 714–715 (1977); *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 642 (1943). Cf. *Elrod* v. *Burns,* 427 U. S. 347, 362–364 (1976) (opinion of BRENNAN, J.). This right is especially worthy of respect in the academic setting, for the denial of associational freedom threatens that cherished spirit of our schools and universities "to inquire, to study and to evaluate," *Sweezy, supra,* at 250, which the First Amendment seeks to preserve. Cf. *Keyishian, supra; Shelton, supra.*

An examination of the record in this case reveals that these two First Amendment freedoms are compromised by Minnesota's statute. As the District Court observed, the formal "meet and confer" sessions in which MCCFA representatives

discuss issues of academic governance with college administrators constitute an "important academic forum." 571 F. Supp. 1, 9 (1982). This forum is critical because, as the District Court found, it is "the primary mechanism for any significant faculty-administration communication," App. to Juris. Statement A–49; because "[t]he views of [the] faculty meet and confer committee are considered by administrators to be the official faculty position on matters discussed in meet and confer sessions," *ibid.*, and because the "meet and confer" sessions represent the "exclusive formal process for formulating and communicating a collective faculty position on policy questions," *id.*, at A–50. As might be expected given the centrality and importance of these sessions, many nonunion faculty members view participation in the "meet and confer" process as "essential to their role on the faculty." *Id.*, at A–51. Indeed, if one considers the broad catalog of issues that are commonly addressed during "meet and confer" sessions—curriculum proposals, academic standards, budgetary matters, and so forth—it is easy to see why the excluded faculty members would regard this restriction as a threat to their ability to function as full members of the academic community.[2]

As the District Court also found, however, the ability to participate in this essential and centrally important process is fundamentally "impaired" when a faculty member refuses to join MCCFA. *Ibid.* By restricting participation in the "meet and confer" process to union members, Minnesota has

---

[2] Although informal avenues of communication remain open to dissident faculty members, this cannot obscure the critical finding that the "official" view of the faculty is formulated and conveyed to the administration through the "meet and confer" process, from which nonunion faculty members are excluded solely on account of their refusal to join MCCFA. It seems to me plain that these faculty members have a right to participate in a process as vital and important to the life of their academic community as the formal communication to college administrators of faculty positions, and that this right cannot be fully protected by sporadic and informal opportunities to confer with the administration.

put direct pressure on nonunion faculty members to join MCCFA. See *ibid.* If those faculty members want to remain full members of the academic community, they must abandon their personal or ideological objections to associating with MCCFA. Especially in the academic setting where respect for these associational rights is considered fundamental to the protection of freedom of thought, such associational conformity is far too high a price to exact for the right to express one's views on questions of academic policy.

Of course, if the "meet and confer" process did not play such a central and important role in formulating academic policy in Minnesota's community colleges or if other avenues of communication provided nonunion faculty a nearly equivalent mechanism for expressing their views, the First Amendment would not be violated, since in those circumstances nonunion faculty members would not be faced with a Hobson's choice between exercising their right to participate in academic policy discussions and preserving their associational rights. Similarly, if the Minnesota statute were more narrowly tailored so that all faculty members, regardless of union affiliation, could participate in the selection of "meet and confer" committees, there would be no encroachment upon associational or free speech interests. Such a narrowly drawn statute would fully serve the State's interest in hearing only from a manageable number of voices and would avoid infringement of the rights of nonunion faculty.

As we have often recognized, the use of an exclusive union representative is permissible in the collective-bargaining context because of the State's compelling interest in reaching an enforceable agreement, an interest that is best served when the State is free to reserve closed bargaining sessions to the designated representative of a union selected by public employees. See *Abood, supra,* at 223–226. See also *Madison Joint School Dist. No. 8* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167, 178 (1976) (BRENNAN, J., concurring in judgment). But in the distinctive context of "meet and confer" sessions—which embrace a broad array of sensitive

policy matters and which serve only to provide information, not to establish any element of a collective-bargaining agreement—the State's interest in admitting no one other than an exclusive union representative to such sessions is substantially diminished. The views expressed by a union representative will only furnish college administrators with an incomplete and imperfect account of the wide-ranging views of the entire faculty. The *Abood* rationale, therefore, does not justify this statutory restriction on the ability of nonunion faculty members to convey to college administrators their views on matters of importance to the academic community.

Accordingly, I would affirm the judgment of the District Court.

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins in all but Part III, and with whom JUSTICE POWELL joins in all but Part II, dissenting.

The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." Laws enacted by state legislatures are subject to this prohibition. *Gitlow* v. *New York,* 268 U. S. 652 (1925). The question in this case is whether Minnesota's statute granting unions preferential access to the policymaking deliberations of public agencies, while prohibiting comparable access for others, is such a law.

We need not consider whether executives or legislators have any constitutional obligation to listen to unsolicited advice to decide this case. It is inherent in the republican form of government that high officials may choose—in their own wisdom and at their own peril—to listen to some of their constituents and not to others. But the First Amendment does guarantee an open marketplace for ideas—where divergent points of view can freely compete for the attention of those in power and of those to whom the powerful must account. The Minnesota statute places a significant restraint on that free competition, by regulating the communication that may take place between the government and those governed. As the District Court found, the statute gives only one speaker a

realistic opportunity to present its views to state officials. All other communication is effectively prohibited, not by reference to the time, place, or manner of communication, or even by reference to the officials' willingness to listen, but rather by reference to the identity of the speaker. The statute is therefore invalid because the First Amendment does not permit any state legislature to grant a single favored speaker an effective monopoly on the opportunity to petition the government.

I

The Minnesota Public Employment Labor Relations Act (PELRA), Minn. Stat. §§ 179.61–179.76 (1982), applies to the State itself, to its political subdivisions, and to its administrative agencies. While this case involves the state community college system, the statutory scheme applies to any public employer that engages in collective bargaining and has policymaking responsibilities in areas beyond its contractual relationships with its employees. It is its unique regulation of the public agencies' process of formulating policy concerning other subjects that makes the statute vulnerable to constitutional attack.

In this appeal, there is no dispute that Minnesota may limit the process of negotiation on the terms and conditions of public employment to the union that represents the employees in a given collective-bargaining unit. This is accomplished by § 179.66, subd. 7, of the statute, which forbids an employer to "meet and negotiate" with anyone except the union's representatives. "Meet and negotiate" is defined as the process of collective bargaining on "terms and conditions of employment," § 179.63, subd. 16, which

> "means the hours of employment, the compensation therefor including fringe benefits except retirement contributions or benefits, and the employer's personnel policies affecting the working conditions of the employees. In the case of professional employees the term does not mean educational policies of a school district. The terms in both cases are subject to the provisions of section

179.66 regarding the rights of public employers and the scope of negotiations." § 179.63, subd. 18.

The portion of the statute under challenge here has nothing to do with the process of negotiating labor contracts. The challenged provisions prohibit the exchange of any "view" concerning the policies of the public employer between the employer and any employee except the majority union's representatives. The same portion of the PELRA that limits labor negotiations to the union's representative, also forbids public agencies to "meet and confer" with any employee or group of employees except a representative of the employees' union:

> "*The employer shall not* meet and negotiate or *meet and confer with any employee or group of employees* who are at the time designated as a member or part of an appropriate employee unit *except through the exclusive representative* . . . provided that this subdivision shall not be deemed to prevent the communication to the employer, other than through the exclusive representative, of advice or recommendations by professional employees, when such communication is a part of the employee's work assignment." § 179.66, subd. 7 (emphasis supplied).

The provision exempting individual communications from the otherwise all-encompassing abridgment of speech is limited to communication that "is a part of the employee's work assignment." Thus, a French professor could confer with his employer about Voltaire or Daudet but could not suggest that the football team needs a new coach, that the endowment fund should divest itself of South African investments, that the admissions committee should modify its affirmative-action program, or that the faculty should organize a drive for the March of Dimes.[1]

---

[1] The other statutory provision protecting the individual's right to communicate with an employer is also carefully limited to conversations that (a) concern terms and conditions of employment and (b) do not interfere

The breadth of the communication prohibited by this statute is remarkable. The "meet and confer" process in which only the majority union can participate is defined broadly to encompass "the exchange of views and concerns between employers and their respective employees." § 179.63, subd. 15. The statute itself imposes no limit on the subjects that might be covered by the "meet and confer" system; in its application to other agencies, that system could encompass the entire range of public policy questions. Thus, in terms the statute says that a public employee may not exchange any views on virtually any public policy question with his or her employer. Appellants suggest no narrowing construction of these statutory terms, nor would it be appropriate for this Court to attempt in the first instance to construe the statute to mean something other than what it plainly says. The District Court found that the statute has been applied to mean what it says. In the community college program, the District Court found that the "subjects covered by the meet and confer system include new course proposals and other curriculum matters, budgetary planning, development of facilities, student rights and student affairs generally, evaluation of administrators, selection of college presidents, academic accreditation of the community colleges, and other matters." App. to Juris. Statement A–49.

Not only are employees who are not selected to represent the majority union's views disabled from expressing their own opinions to their employers, but the union is guaranteed ample opportunities to do what no one else can. The statute places public employers under an obligation to meet and confer with the majority union's representative at least once every four months. §§ 179.66, subd. 3, 179.73. Moreover,

---

with the rights of the exclusive bargaining representative. Thus it is limited to the "meet and negotiate" context not at issue here. It reads as follows:

"Nothing contained in sections 179.61 to 179.76 shall be construed to limit, impair or affect the right of any public employee or his representative to the expression or communication of a view, grievance, complaint or

the statute acknowledges that the "meet and confer" process is critical to the process of formulating public policy.[2]

As might be expected, the statutory prohibition has had an adverse impact on conversation and communication between teachers and administrators in the State's community college system. Although the "meet and confer" sessions with the majority union are open to all faculty members, no one can speak without the union's permission.[3] In practice, observers have not been permitted to speak.[4] The statute thus gives the majority union in the system an effective veto over the right of dissident faculty members to communicate their views to the administration.[5] College administrators under-

---

opinion on any matter related to the conditions or compensation of public employment or their betterment, so long as the same is not designed to and does not interfere with the full faithful and proper performance of the duties of employment or circumvent the rights of the exclusive representative if there be one . . . ." § 179.65, subd. 1.

[2] "The legislature recognizes that professional employees possess knowledge, expertise, and dedication which is helpful and necessary to the operation and quality of public services and which may assist public employers in developing their policies. It is, therefore, the policy of this state to encourage close cooperation between public employers and professional employees by providing for discussions and the mutual exchange of ideas . . . ." § 179.73, subd. 1.

[3] "Q. Assume the following facts, then, based on your experience as President and also serving on the committees, assume that a person who is not on the Exchange View Committee was present in the room and tried to present his views. Would he be permitted to present his views?

"A. We have within the college a procedure for exchange of views, as we call it, and we have the provision for special witnesses. Prior to each meeting the Chairperson of the faculty and the Chairperson of the Administration can agree on such witnesses. The meetings are totally open so any faculty member may attend the meetings and not speak. But, only special witnesses may speak. So, it takes the agreement between the Chairpersons—faculty and chairperson of the Administration on special witnesses.

"Q. So, either side could block a special witness appearing?

"A. That is correct." App. A–92.

[4] See id., at A–48. See also id., at A–185 to A–186.

[5] "Q. And on the other hand the committee also has the power or at least one side of that committee has the power to make sure nobody from the

stand the PELRA to prohibit them from listening to the views except those of the majority union, and they have acted in accord with that understanding.[6]  As a result, much less communication between faculty members and college administrators occurs under the statute because both administrators and teachers fear that if they exchange views, especially when the exchange involves nonunion faculty members, they will be violating the PELRA.[7]  Those conversations

---

faculty other than the people that are on that committee and those appear as a special witness, is that right?

"A. That's correct."  *Id.*, at A–104.

To similar effect, see *id.*, at A–95.

[6] "Q. What's the policy of the Administration with respect to engaging in meet and confer or exchange of view processes with persons other than the Faculty Association?

"A. Well, we are not supposed to do it."  *Id.*, at A–79.

"Q. And the Board also recognizes that it must not meet and confer formally with individual teachers who might demand such an opportunity?

"A. Yes.

"Q. And that is because, is it not, that for the Board to do so would violate the Faculty Association's exclusive privilege to meet and negotiate, is that correct?

"A. My understanding is that to do otherwise would violate the law in the collective bargaining.

"Q. Both as to negotiation and as to conferring?

"A. Meet and confer in a formal sense of the word, yes.

"Q. So the State Board, in fact, does not meet and negotiate with any faculty group other than the MCCFA?

"A. That's correct.

"Q. And in fact, on the college campuses the Administration does not— or at least is not supposed to meet and confer or engage in an exchange of views with any group other than the Faculty Association?

"A. In a formal sense, yes."  *Id.*, at A–58.

See also *id.*, at A–76 to A–77, A–87, A–162 to A–163.

[7] "Q. And then after . . . January of '71, was an individual free to discuss anything he wanted?

"A. Yes.

"Q. Has that been also true since the adoption of the contract [pursuant to the PELRA] in April of '73?

"A. Well, I think that, technically, the person has been free to do that and the administrator's been free to do that, but I think that practically—

that do still occur often are useless as a practical matter, since the administrator often responds only by saying that the subject must be discussed in a different forum.[8]   Thus

---

many such situations have disappeared because of the fear on the part of the administrator that they would be meeting and conferring or negotiating with someone other than the exclusive representative, and the problem of defining what's meeting and conferring and what's negotiation, I think has been the basic problem." *Id.*, at A–44 to A–45.

"Q. Since 1973 have you ever felt or have you ever been advised by President Helling not to speak with him?

"A. I have been assiduous in my attempt to avoid placing him in a position where he would have to make that type of judgment.

"Q. Is that based on anything that has been told to you by any college administrator?

"A. No.   It's based on what's told to me by the Master Contract." *Id.*, at A–148.

"A. I am not free to speak to my administration relative to curriculum matters.   I am not free to speak to my administration relative to personnel matters.   I am, in point of fact, not free to speak with my administrators on anything which is covered by the Master Contract . . . .

.          .          .          .          .

"Q. Do you understand that the administration intends to enforce the terms of that Contract?

"A. I do not wish to place the administration in the awkward position of having to make that judgment.   I believe that I am—no matter how noxious I might find the Master Contract—bound by it because of the law.   So I don't run around talking to the administration about things which are forbidden by the Master Contract.   I don't want to put them in that position." *Id.*, at A–151 to A–152.

[8] "Q. When you said exchange of views, when people, when faculty members come in and talk to you, and obviously you're not going to show them out and say get out, but you brought this up yourself, you may say there is a more appropriate form *[sic]*.   In other words, discuss it, you will listen to them certainly and your response may be there is a more appropriate form *[sic]* for this, is that right?

"A. That is correct.

"Q. From their point of view at least the discussion may not be meaningful because you cannot afford them the remedy they are looking for, is that correct?   In other words, they'll have to go to the form *[sic]* that the problem form *[sic]?*

"A. I think I can answer, yes, to that if I understand." *Id.*, at A–104.

the PELRA has substituted a union-controlled process for the formerly free exchange of views that took place between faculty and the administration.[9]   In practice, the union has a monopoly on the effective opportunity to present views to the administration on the wide range of subjects covered by the "meet and confer" process.[10]

"Q. And have you ever advised any Plaintiff in this case or any faculty member that they cannot discuss with you any matter that they wish to discuss?

"A. No.   The answer would be no.   However, once we get into a discussion I may say it's more appropriately discussed in another forum. But, I wouldn't even know how to keep people from discussing something that they would want to discuss.

"Q. Have you ever advised any of your administrators that they cannot meet with faculty members to discuss matters which the faculty member might wish to discuss?

"A. No.   However, there we do have clearly a structure and an understanding of where particular items and issues are discussed. . . . But, clearly I have never given any advice to an Administrator not to discuss an issue of importance to a faculty member.   But, I do know that they might refer them to an appropriate place and it will be discussed within that place before a decision is made."   *Id.*, at A–101.

See also *id.*, at A–62 to A–63, A–152 to A–153.

[9] "Q. And now the free exchange or the free discussion has become an exchange of views in the formal setting, isn't that correct?

"A. I don't think it's correct to consider one completely replacement *[sic]* for the other.   It's like different processes.   You referred earlier to individual people, that doesn't, you can't compare that with the exchange of view process that takes place now."   *Id.*, at A–59.

[10] "Q. Well, these Exchange of View Committees that are established by the contract are the exclusive channels for dealings between the Administration and the faculty on matters that are within the jurisdiction of those committees, is that correct?

"A. I believe so, yes.

.          .          .          .

"Q. Every subject appropriate for exchange of views between the faculty and Administration will be within the jurisdiction of one of these committees, isn't that correct?

"A. We do not—there are six possible committees.   We only have three on our campus and they are the three that I mentioned, General Matters of Curriculum and Fiscal/Personnel.   Therefore, we do not talk about mat-

The District Court found that under the statute "the weight and significance of individual speech interests have been consciously derogated in favor of systematic, official expression." 571 F. Supp. 1, 8 (1982). "[The] PELRA has made the formal meet and confer process the primary mechanism for *any significant faculty-administration communication* on such policy questions." App. to Juris. Statement A–49 (emphasis supplied). It concluded that the "meet and confer" process "is the only significant forum for the faculty to resolve virtually every issue outside the scope of mandatory bargaining. *This structure effectively blocks any meaningful expression by faculty members who are excluded from the formal process.*" 571 F. Supp., at 9 (emphasis supplied). These findings may not be set aside unless clearly erroneous, see *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844 (1982); *Pullman-Standard* v. *Swint*, 456 U. S. 273 (1982), and in any event are not challenged by appellants or the Court.

## II

Both the plain language of the statute and the District Court's findings concerning its actual operation demonstrate that it is a law abridging the freedom of speech. This is true both because it grants unions especially favored positions in communicating with public policymaking bodies and because it curtails the ability of all other members of the public to communicate effectively with those public bodies.

There can be no question but that the First Amendment secures the right of individuals to communicate with their government. And the First Amendment was intended to se-

ters that fall under the other three committees like Personnel—I forget what the other committees could be, I guess Student Services.

"Q. Okay.

"A. The General Matter, to clarify though, is really a casual, and I guess I should answer yes to your question because in the General Matters Committee anything could be brought up." *Id.*, at A–72 to A–73.

cure something more than an exercise in futility—it guarantees a *meaningful* opportunity to express one's views. For example, this Court has recognized that the right to forward views might become a practical nullity if government prohibited persons from banding together to make their voices heard. Thus, the First Amendment protects freedom of association because it makes the right to express one's views meaningful. See *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 907–908 (1982); *Citizens Against Rent Control* v. *Berkeley*, 454 U. S. 290, 295–299 (1981); *Bates* v. *Little Rock*, 361 U. S. 516, 522–523 (1960); *NAACP* v. *Alabama*, 357 U. S. 449, 460–461 (1958).[11] Because of the importance of this right to play a *meaningful* part in the "uninhibited, robust, and wide-open" debate envisioned by the First Amendment, *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964), the Court has not permitted government to deny associational rights critical to this opportunity unless the abridgment is no broader than necessary to serve a vital state purpose.[12]

---

[11] We have also held that collective activity is protected in order to obtain "meaningful" access to the courts, *United Transportation Union* v. *Michigan Bar*, 401 U. S. 576, 585–586 (1971); see *In re Primus*, 436 U. S. 412, 426 (1978); *Mine Workers* v. *Illinois Bar Assn.*, 389 U. S. 217 (1967); *Railroad Trainmen* v. *Virginia ex rel. Virginia Bar*, 377 U. S. 1 (1964), and in order to make meaningful the right to vote and to participate in the political process. See *Anderson* v. *Celebrezze*, 460 U. S. 780, 786–788 (1983); *Brown* v. *Socialist Workers '74 Campaign Committee*, 459 U. S. 87, 91–92 (1982); *Buckley* v. *Valeo*, 424 U. S. 1, 65–66 (1976) *(per curiam); Cousins* v. *Wigoda*, 419 U. S. 477, 487–488 (1975); *Kusper* v. *Pontikes*, 414 U. S. 51, 56–58 (1973); *Williams* v. *Rhodes*, 393 U. S. 23, 38–41 (1968) (opinion of Douglas, J.); *id.*, at 41 (Harlan, J., concurring in result).

[12] See *Brown* v. *Socialist Workers '74 Campaign Committee*, 459 U. S., at 92–93; *In re Primus*, 436 U. S., at 432; *Buckley* v. *Valeo*, 424 U. S., at 64–65; *Cousins* v. *Wigoda*, 419 U. S., at 489; *American Party of Texas* v. *White*, 415 U. S. 767, 780 (1974); *Kusper* v. *Pontikes*, 414 U. S., at 56–58; *NAACP* v. *Button*, 371 U. S. 415, 439 (1963); *Shelton* v. *Tucker*, 364 U. S. 479, 488 (1960); *Bates* v. *Little Rock*, 361 U. S. 516, 524 (1960).

The First Amendment also protects the public employee's right *not* to associate. Just as "the Legislature could not require allegiance to a particular political faith as a condition of public employment," *Illinois State Employees Union, Council 34* v. *Lewis*, 473 F. 2d 561, 570 (CA7 1972), so is it equally clear that the legislature could not require an employee to subscribe to the political tenets of a particular labor union.[13] In *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977), we held that nonunion members cannot be compelled to contribute to the partisan political activities of the union which represents them, because that would have the forbidden effect of compelling them to support advocacy with which they do not agree and thereby to infringe their associational rights. See *id.*, at 233–237.[14]

The findings of the District Court in this case indicate that access to the "meet and confer" process is essential if appellees are to be able to express their views effectively on issues involving their colleges. The statute prohibits them from expressing "any view" on issues affecting their colleges to the administration, and as a practical matter it "blocks effectively

---

[13] The District Court found that this statutory scheme requires appellees to join the union if they are to have any meaningful voice because "the [majority union's] exclusive authority to select the committee representative—regardless of how it is actually exercised—inherently creates a chilling effect on the associational and speech interests of faculty members. The scope of the meet and confer committees reaches many issues that are integral to the professional function of a college professor. If one risks exclusion from these committees by not joining in or speaking out against the [union], it seems self-evident that one's freedom not to join or to so speak out is seriously impaired. This risk of exclusion is inherent in the [union's] sole authority to select the committee members. The actual practice only bears out that the risk of exclusion is a real one." 571 F. Supp. 1, 10 (1982).

[14] See generally *Wooley* v. *Maynard*, 430 U. S. 705, 714–715 (1977); *Stanley* v. *Georgia*, 394 U. S. 557, 565 (1969); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943). See also *Elrod* v. *Burns*, 427 U. S. 347, 355–360 (1976) (plurality opinion).

meaningful expression" by appellees on the public policy is-
sues facing the state agencies which employ them.[15] More-
over, the broad sweep of the plain language of the statute has
in fact deterred the exercise of First Amendment rights,
since public employees and employers cannot be sure if they
may exchange views without violating the statute.[16] It is
precisely because such broadly worded statutes inhibit free
expression that they have been invalidated even when they
are being applied in a constitutional manner.[17]

## III

The Court suggests that associational rights are ade-
quately protected because appellees remain free to associate
in order to express their views outside of the "meet and con-
fer" process. *Ante*, at 289–290. This claim parallels the one
advanced in *Healy* v. *James*, 408 U. S. 169 (1972). There a
state university denied a student group access to university

---

[15] The Court assumes that the statute does not impair the ability of ap-
pellees to express their views "outside" the "formal" "meet and confer"
context. *Ante*, at 277–278, n. 4. However, there is nothing in the stat-
ute that limits its scope to some sort of "formal" context—it prohibits
the expression of "any view."

[16] There is evidence that the sweeping language of the PELRA, which
has not been given a narrowing construction either by the state courts, the
District Court, or appellants, has in fact had a chilling effect on the ex-
change of ideas. See n. 7, *supra*.

[17] Under our cases the risk of deterring the free exchange of ideas is rea-
son to invalidate the sweeping language contained in the challenged provi-
sions of the PELRA. See *New York* v. *Ferber*, 458 U. S. 747, 768–769
(1982); *Central Hudson Gas & Elec. Corp.* v. *Public Service Comm'n of
N. Y.*, 447 U. S. 557, 565, n. 8 (1980); *Ulster County Court* v. *Allen*, 442
U. S. 140, 155 (1979); *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 380
(1977); *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 59–60 (1976);
*Gooding* v. *Wilson*, 405 U. S. 518, 521 (1972); *Keyishian* v. *Board of
Regents of University of New York*, 385 U. S. 589, 609 (1967); *Dombrowski*
v. *Pfister*, 380 U. S. 479, 494 (1965); *NAACP* v. *Button*, 371 U. S., at
432–433.

facilities. The Court rejected the argument that this exclusion did not impair First Amendment rights since the student group remained free to associate in order to advocate its views off-campus:

> "We may concede, as did Mr. Justice Harlan in his opinion for a unanimous Court in *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S., at 461, that the administration 'has taken no direct action . . . to restrict the rights of [petitioners] to associate freely . . . .' But the Constitution's protection is not limited to direct interference with fundamental rights. The requirement in *Patterson* that the NAACP disclose its membership lists was found to be an impermissible, though indirect, infringement of the members' associational rights. Likewise, in this case, the group's possible ability to exist outside the campus community does not ameliorate significantly the disabilities imposed by the President's action. We are not free to disregard the practical realities." *Id.*, at 183.

Just as the denial of access to campus facilities in *Healy* had a critical impact on First Amendment rights, the denial of access to campus administrators in this case has an equally critical impact on the opportunity to be heard. As the District Court found, in reality the "meet and confer" process is the only meaningful chance appellees have to influence public policy. "If some faculty members are excluded from participation and deliberation in the meet and confer process, they are effectively denied any meaningful expression on the issues resolved through that process." 571 F. Supp., at 8. This statute has effectively muted appellees' voices.[18] The

---

[18] The Court relies on the District Court's finding in its first opinion in this litigation that college faculty are still able to "informally" express their views to administrators. *Ante*, at 277–278, n. 4. However, the same District Court, in its second opinion which concluded that the PELRA was unconstitutional, found that this opportunity was theoretical at best; in practice the only realistic opportunity to express views was the opportu-

Court's conclusion to the contrary rests only on its willingness "to disregard the practical realities." 408 U. S., at 183.[19]

The Court's analysis is rooted simply in the notion that "[a]ppellees have no constitutional right to force the government to listen to their views." *Ante*, at 283. No claim is made that college administrators do not want to hear what appellees have to say; to the contrary the administrators claim that they are willing to listen to the views of appellees. The problem is that the administrators are statutorily prohibited from listening. Indeed, the Court distinguishes *Healy* by arguing that that case involved a group seeking to communicate with "potentially willing listeners." *Ante*, at 289, n. 10. That is no distinction at all; the college administrators here are potentially willing listeners as well. It is only the

---

nity given to the union and the union alone. As noted in the text, the court found that faculty members "are effectively denied any meaningful expression," 571 F. Supp., at 8, and that "[t]his structure effectively blocks any meaningful expression by faculty members who are excluded from the formal process." *Id.*, at 9. The Court tries to dismiss this "as a mixed statement of law and fact," *ante*, at 290, n. 12, but I do not see how a finding that appellees have no realistic opportunity to express their views is anything but a finding of fact. The legal conclusion is drawn by the Court—it takes the position that it makes no difference whether appellees have any realistic chance to express their views. That willingness to ignore practical realities not only overlooks the teaching of *Healy*, but it makes the protection of the First Amendment illusory at best.

[19] One of the "practical realities" the Court overlooks is the fact that the enlargement of the scope of the union's exclusive authority is itself evidence that this statute is an abridgment of appellees' freedom of speech. In seeking the enactment of this legislation the union surely perceived its practical value. It is no accident that in this Court the oral argument in favor of the validity of the statute was presented by an attorney for the union rather than by a public official. The statute is a significant, highly practical means of amplifying the voice of majority unions at the expense of others. If the union did not think that this statute would enhance its ability to influence public policy, at the expense of the abilities of its competitors to do the same, it would hardly have the stake in the statute's validity that it evidently thinks it has.

statute that prevents appellees from communicating with those in charge of public policy.

Moreover, the District Court found that prior to the passage of the challenged statute, appellees were able to participate in the "meet and confer" process.[20] Their former ability to communicate with the administration has been impaired not by the administration's unwillingness to listen, but by the challenged statute. Any realistic appraisal of the effects of such a restriction must lead to the conclusion that this statute has restricted the traditional freedom of speech appellees had once enjoyed. "[T]he capacity of a group or individual 'to participate in the intellectual give and take of campus debate . . . [would be] limited by denial of access to the customary media for communicating with the administration, faculty members, and . . . students.'" *Widmar* v. *Vincent*, 454 U. S. 263, 267–268, n. 5 (1981) (quoting *Healy*, 408 U. S., at 181–182).

In short, by prohibiting the administration from listening to appellees, the PELRA ensures that appellees' speech can have no meaningful impact upon the administration. Appellees do not rely on the government's "obligation" to hear them; they rely only on their right to have a meaningful opportunity to speak. If a public employer does not wish to listen to appellees, that is its privilege, but the First Amendment at least requires that that decision be made in an open marketplace of ideas, rather than under a statutory scheme that does not permit appellees' speech to be considered, no matter how much merit it may contain.[21]

---

[20] "Traditionally, the subjects of meet and confer have been resolved through governance systems in which all faculty members have an opportunity to participate. In the present case, governance at community colleges prior to passage of PELRA consisted of faculty senates and committees, selected through elections in which every faculty member was eligible to both vote and seek election." 571 F. Supp., at 8.

[21] The Court finds this proposition "shocking," and concludes that it would destroy the ability of public officials from the President of the United States on down to select whomever it is that he or she wishes to

## IV

No one suggests that the Minnesota statute has been narrowly tailored to serve a compelling state interest.[22] The only interest appellants claim the statute serves is in protecting the status of the public employees' exclusive representative.[23] It is now settled law that a public employer may

---

consult. *Ante*, at 281, n. 6. The Court is simply mistaken. Nothing I have said implies that public policymakers must listen to any given point of view, much less that they must give all persons individualized notice and opportunity for hearing, which is all that *Bi-Metallic Investment Co.* v. *State Board of Equalization*, 239 U. S. 441 (1915), relied upon by the majority, *ante*, at 283–285, involved. That case did not present, or consider, any First Amendment issue. An analogy much closer to the PELRA than *Bi-Metallic* would be a statute passed by a Democratic legislative majority prohibiting all legislators from consulting with their Republican constituents. Even this Court might balk at such a statute, but it would not offend the rationale of the majority's opinion. If the President, or a college administrator, does not think it worthwhile to consult with appellees, he of course is free to make that decision. The Minnesota statute, in contrast, does not permit that decision to be made. Minnesota has delegated public policymaking to various employers, but at the same time required that those policies be made in a closed environment where citizens are not even given any realistic opportunity to petition those policymakers for redress of grievances, and policymakers are not free to decide whether they wish to consider the views of disfavored speakers.

[22] While the Court denies that the statute has a sufficient effect on free speech to require that it be narrowly tailored to a compelling state interest, it does suggest that the statute can survive a less demanding form of scrutiny in that it is rationally related to the State's "interest in ensuring that its public employers hear one, and only one, voice presenting the majority view of its professional employees . . . ." *Ante*, at 291. However, appellants themselves do not even articulate such an interest. Moreover, as I will explain below, *infra*, at this page and 316, the majority union is constitutionally prohibited from representing the "majority view" with respect to the subjects of the "meet and confer" process, and therefore the factual predicate for the majority's conclusion is erroneous. I will also address, *infra*, at 317–323, the constitutional "legitimacy" of this novel "interest" in ensuring that only one point of view can be expressed on matters of public policy.

[23] Appellants do not even attempt to argue that administrators must be statutorily prohibited from hearing the views of dissident faculty members if they are to run the community college system efficiently. The District

negotiate only with the elected representative of its employees, because it would be impracticable to negotiate simultaneously with rival labor unions. See *Abood* v. *Detroit Board of Education*, 431 U. S., at 224–226.[24] But in *Abood* we explicitly held that exclusivity could not be extended to areas beyond the statutorily mandated subjects of collective bargaining, since such an extension would impair the associational rights of those who do not wish to join the union. See *id.*, at 232–237. Here, the areas subject to the "meet and confer" process are by definition not subjects of collective bargaining. While a public employer cannot contract with more than one union at a time, as the Court points out, it can confer with as many groups as it desires. *Ante*, at 284. The need to conduct collective bargaining with only one employee representative does not justify prohibiting college administrators from conferring with other employees on topics not the subject of collective bargaining. That is the teaching of *Abood*.[25]

---

Court made no finding to that effect, nor is there anything in the record to support such a finding:

"Q. Now, did this free exchange of views prior to 1973 in anyway interfere with the operation of the college?

"A. From the point of view of administration, I don't think it did." App. A–60.

[24] See also *Railway Employees* v. *Hanson*, 351 U. S. 225 (1956).

[25] *Smith* v. *Arkansas State Highway Employees*, 441 U. S. 463 (1979) *(per curiam)*, on which the majority relies so heavily, *ante*, at 285–288, involved the procedure for processing union grievances, and simply held that a public employer may choose *not* to permit the union to be the spokesman for employees on those matters. That case sheds no light on the legitimacy of *requiring* the majority union to be the exclusive spokesman on political issues. The total absence of judicial support for the Court's holding explains why it relies instead on somewhat extravagant references to the practice of legislatures throughout the Nation, a concern about "a revolution in existing government practices," and a fear that government "would likely grind to a halt" if this statute were not upheld. *Ante*, at 284–285. Yet the Court fails to identify even one statute, state or federal, which has defined access to a policymaking forum on the basis of the point of view of

There is a simple, but fundamental, reason why the state interest in exclusivity cannot sustain this statute. That interest creates a preference for the views of majority unions which itself infringes the principles of the First Amendment. In *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972), the Court considered the constitutionality of a Chicago ordinance that granted labor unions access to a narrowly defined forum and denied such access to all other speakers. The forum in that case was the area "within 150 feet of any primary or secondary school building while the school is in session" and for one-half hour before and after school sessions, *id.*, at 92–93; the method of communication was peaceful picketing. Unions, but no one else, were allowed access to that narrow forum. The Court unanimously held the ordinance unconstitutional. After pointing out that the ordinance allowed peaceful picketing on the subject of a school's labor-management dispute, but prohibited all other peaceful picketing, the Court continued:

> "Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say." *Id.*, at 96 (footnote omitted).[26]

We have consistently adhered to the principle that government must "afford all points of view an equal opportunity to

---

the speaker. The closest analogues that I have found are the cases I discuss above.

[26] See also *Grayned* v. *City of Rockford*, 408 U. S. 104, 107 (1972).

318

be heard."[27]  The majority claims that this principle does not apply to closed proceedings not open to any form of public access.  *Ante*, at 280–283.  In fact, however, the "meet and confer" sessions are open to the public and are held in public places.  Moreover, the State permits participation by the union's representatives but no others.  When a State permits some speakers but not others access to a forum for communication, it must justify its exclusions as viewpoint-neutral.  See *Widmar* v. *Vincent*, 454 U. S., at 267–268; *Madison Joint School District No. 8* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167, 175, and n. 8 (1976); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 555–559 (1975).  Surely that principle cannot be avoided by the simple expedient of using the speaker's point of view as the criterion for defining the scope of access to a publicly sponsored forum.  Indeed, the case on which the majority principally relies, *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37 (1983), states that government may not restrict access to channels of communication as an attempt "to discourage one viewpoint and advance another."  *Id.*, at 49.

Here, by giving the union exclusive rights with respect to the primary avenue for communication with college administration, the Minnesota statutory scheme plainly advances the union's viewpoint at the expense of all others.  The District Court found that the PELRA "consciously" derogated the weight of individual speech interests in favor of the majority union's interests.  The controlling authority is therefore *Madison Joint School District No. 8* v. *Wisconsin Employment Relations Comm'n, supra.*  We wrote:

> "Regardless of the extent to which true contract negotiations between a public body and its employees may be

---

[27] See *Widmar* v. *Vincent*, 454 U. S. 263 (1981); *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 537–538 (1980); *Carey* v. *Brown*, 447 U. S. 455 (1980); *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 209–212 (1975).

regulated—an issue we need not consider at this time—the participation in public discussion of public business cannot be confined to one category of interested individuals. To permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis of constitutional guarantees. Whatever its duties as an employer, when the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of their employment, or the content of their speech. See *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972)." *Id.*, at 175–176 (footnotes omitted).[28]

This statute gives the union the same "monopoly in expressing its views to the government" that we condemned in the *Madison Joint School District* case. The Minnesota "meet and confer" sessions create, in reality, an exclusive method for communication with government, and permit only

---

[28] The Court distinguishes *Madison* by arguing that there the forum—a school board meeting—was open to the public. *Ante*, at 281. That reasoning is tautological—the forum was not open to public employees, who were required to present their grievances through the collective-bargaining process. Thus the "forum" in that case was not an "open" one as far as the plaintiffs were concerned, for the school board had "restricted the class of persons to whom it will listen in its making of policy," *ante*, at 282—the school board did not want to hear from its employees, whom the board thought should be heard only through their union. In *Madison* it was the Constitution that "opened" the forum to teachers; specifically it was the First Amendment that prohibited the exclusion of persons from access to the organs of government based on the school board's desire to give one side a monopoly in expressing its views. Moreover, as the cases cited above indicate, even with respect to "forums" not generally opened to the public, government may not limit access to those forums based on a desire to favor one viewpoint at the expense of another. Finally, to the extent that the Court relies on a "tradition" of openness as a basis for distinguishing *Madison*, *ante*, at 280, as noted above, the District Court found that traditionally appellees had been able to participate in the "meet and confer" process prior to the passage of the PELRA. See also *supra*, at 314.

one point of view to be expressed. The resultant insulation of public policy from exposure to the full range of views is that to which the constitutional ban on viewpoint discrimination is addressed. The views of all have the right to be considered on their merits, rather than to be excluded by statutory prohibition. It is one thing to say, as the majority does, that the government may decline to listen to those whose views it finds unhelpful; it is quite another to say that those views need not be given even a fair chance to compete for the attention of government.

It is instructive to contrast this case with *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37 (1983). In that case the Court upheld a school board's contractual agreement allowing the union representing its teachers to make use of the school mail system in connection with the discharge of the union's exclusive representative duties, without providing equal access to rival unions. That preferential treatment of the union was justified by reference to the collective-bargaining process. It was thought necessary to facilitate communication between the union and the teachers because of the majority union's exclusive responsibility for negotiation and administration of the collective-bargaining agreement.

> "We observe that providing exclusive access to recognized bargaining representatives is a permissible labor practice in the public sector. We have previously noted that the 'designation of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones.' Moreover, exclusion of a rival union may reasonably be considered a means of insuring labor peace within the schools. The policy 'serves to prevent the District's schools from becoming a battlefield for inter-union squabbles.'" *Id.*, at 51–52 (footnotes and citations omitted).

After recognizing that the right of access to the mail system was accorded to the union "acting as the representative of the teachers," the Court expressly noted that the case did not involve "a grant of access for unlimited purposes." *Id.*, at 53, n. 13. It also noted that there was no showing that the challenged system substantially disadvantaged the ability of other speakers to communicate their messages. *Id.*, at 53–54.

The case the Court decides today involves preferential treatment of the union as a participant in discussions and debates that lead to the formulation of policy not embraced within its collective-bargaining responsibilities. The "meet and confer" process is statutorily defined to be exclusive of the collective-bargaining process which—as *Abood* squarely holds—is the *only* context in which the union can claim a right to exclusive representation of all employees. The collective-bargaining justifications relied upon in *Perry* are entirely absent when, as here, the union has no right—let alone an exclusive right—to act on behalf of other persons.[29] In short, "exclusivity cannot constitutionally be used to muzzle a public employee who, like any other citizen, might wish to express his view about governmental decisions concern-

---

[29] The distinction between the exclusive right to represent employees in connection with bargainable issues and a union's desire to speak for the employees on policy questions was plainly identified in *Abood*. After explaining why even nonmembers could be compelled to share the costs of union representation in the traditional negotiating area, the Court explained why that right did not extend into the policy area:

"Equally clear is the proposition that a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment. The appellants argue that they fall within the protection of these cases because they have been prohibited, not from actively associating, but rather from refusing to associate. They specifically argue that they may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative. We have concluded that this argument is a meritorious one." 431 U. S., at 234 (citations omitted).

ing labor relations . . . ." *Abood,* 431 U. S., at 230. The practical effect of the statutory prohibition on meeting and conferring with anyone but the exclusive representative is to create exactly the sort of "muzzle" condemned by *Abood.*

The First Amendment favors unabridged communication among members of a free society—including communication between employer and employee. The process of collective bargaining requires that a limited exception to that general principle be recognized, but until today we have not tolerated any broadening of that exception beyond the collective-bargaining process. The effect of the Minnesota statute is to make the union the only authorized spokesman for all employees on political matters as well as contractual matters. In my opinion, such state-sponsored orthodoxy is plainly impermissible. The Court, however, relies on a newly found state interest in promoting conformity—the "interest in ensuring that its public employers hear one, and only one, voice presenting the majority view of its professional employees on employment-related policy questions, whatever other advice they may receive on those questions." *Ante,* at 291. The notion that there is a state interest in fostering a private monopoly on any form of communication is at war with the principle that "the desire to favor one form of speech over all others" is not merely trivial; it "is illegitimate." *Carey* v. *Brown,* 447 U. S. 455, 468 (1980).

As I noted at the outset, we are concerned with the constitutionality of a law enacted by the legislature. That law requires all executives administering the community college system—as well as all other public employers—to adhere to the specific "meet and confer" process when formulating public policy. The invalidity of such a law need not impair the discretion exercised by individual public administrators with regard to the identity of the persons from whom, or the time, place, and manner in which, they will accept advice concerning their official conduct. But for the State to preclude the exercise of that discretion—to say that the ideas of all save

the majority union may not compete on their merits—is to impose the kind of restraint on the free exchange of ideas that the First Amendment does not tolerate.

Because I am convinced that the statutorily mandated exclusive "meet and confer" process is constitutionally intolerable, I respectfully dissent.